HELEN D. GROZIER, executrix and trustee, *vs.*
POST PUBLISHING COMPANY & another
(and a companion case).

Suffolk.   December 5, 1960. — February 14, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, CUTTER, & KIRK, JJ.

*Sale,* Price, Of stock.   *Accounting.   Contract,* For sale of stock, Accelera-
tion clause.   *Notice.*

Following the making of a contract for sale of all the stock of a corpora-
tion for a stated price less the operating loss of the corporation in a
certain period, with provisions that the loss should be certified by an
accounting firm, that the buyer might elect to have its certification re-
viewed by a second accounting firm, and that the final result with or
without such a review should be a "conclusive determination" subject
to adjustments for items not "determinable or determined" before a
specified date, a "final net loss" certified by the first accounting firm
more than two years after such date, of which the buyer did not elect
a review by the second accounting firm, might properly on the evidence
be found to have allowed for all required adjustments and to be con-
clusive between the parties.   [101–103]
A conclusion that a seller of all the stock of a corporation had not mis-
represented in a balance sheet the amount of the corporation's liability
for severance pay of employees was warranted where the contract of
sale was made on the basis of the corporation being a going concern and
there was evidence that the amount stated in the balance sheet for re-
serves was adequate for severance pay on that basis, irrespective of the
amount which might have been required had the corporation been li-
quidated on the date of the balance sheet.   [103–104]
Under a contract for sale of all the stock of a corporation providing that
the buyer should notify the seller of claims "with reasonable prompt-
ness," a conclusion was warranted that a claim of the buyer first made
more than two years later, that the liability of the corporation for sev-
erance pay had been misrepresented by the seller, was not made "with
reasonable promptness."   [104]
A provision of a contract that in the event of default in payment of an
instalment of a debt payable in instalments the entire unpaid balance
should "forthwith become due" did not, upon such default, automatically
accelerate the maturity of later instalments in the absence of any mani-
festation of an election by the creditor to accelerate it.   [105–107]

Two BILLS IN EQUITY, filed in the Superior Court on July
11, 1956, and July 18, 1956.

The suits were heard by *Tomasello, J.*

*George Broomfield,* for Fox.

*Francis J. Ulman,* for Grozier.

CUTTER, J. These are appeals upon a consolidated record from final decrees in two equity proceedings. One suit was brought by Mrs. Grozier (the executrix) as surviving executrix and successor trustee of the will of Richard Grozier against Post Publishing Company (Publishing) and John Fox. The other suit was by Fox and Publishing against Second Bank–State Street Trust Company (State Street) and the executrix. The executrix seeks to enforce an agreement, dated June 17, 1952 (the 1952 agreement). By this, she and her then co-executor, who has since died, undertook to sell to Fox all the stock of Publishing. Fox's bill, apart from asking injunctive relief no longer of importance, sought to obtain an accounting and a determination that the executrix had made false representations in violation of the 1952 agreement and that there had been breaches of warranties contained in that agreement. The cases were tried together.

The trial judge found the following facts. The 1952 agreement set September 2, 1952, as the closing date for the sale of the stock for $4,000,000, less the amount of Publishing's operating loss for the eight months from January 1, 1952, to August 31, 1952, to be computed on a basis and by a procedure mentioned in the margin.[1] All Publishing's stock was to be deposited on the closing date with State Street as escrow agent and Fox was then to pay $2,000,000 "as an initial payment." The balance was to be paid, one

---

[1] Under the contract this eight-month operating loss was to be determined as follows: "On or before January 1, 1953, . . . the accounting firm of Ralph S. Perkins & Co. . . . [shall] certify the operating loss . . . for the eight-month period and report such loss in the usual form of profit and loss statements prepared by them for the [c]ompany for the calendar years 1948 through 1951, subject to the provisions of paragraph '2' of this [a]greement. . . . [W]ithin fifteen . . . days after receipt by . . . [Fox] of said certification, . . . [Fox] may elect to have . . . [it] reviewed by the firm of Haskins & Sells . . . . Whether the certification of Ralph S. Perkins & Co. is accepted by . . . [Fox] without review or in the event that . . . [Fox] shall exercise his election to have the same reviewed by the firm of Haskins & Sells, in either

half on or before February 28, 1953,[2] and the remainder on
or before August 31, 1953.    Fox paid $1,300,000 on September 15, 1952, but did not complete payment even of the
whole balance of the $2,000,000 due on September 2, 1952,
until June 10, 1953.

In December, 1952, "an audit report was submitted by
Ralph S. Perkins & Co. [Perkins] which, subject to certain
qualifications . . . , showed . . . [the] net loss . . . for the
eight months . . . . This was reviewed by . . . accountants
for . . . [Fox] and certain adjustments . . . were agreed
upon."    On March 2, 1953, this was adjusted "subject only
to adjustments for accounts receivable uncollected on June
30, 1953, and possible losses in pending law suits."    On
March 1, 1955 (the judge in his findings by inadvertence
refers to an interim report of April 7, 1954), a final net loss
of $761,535.95 was certified by Perkins.    No request was
made by Fox for review of the certifications.    Upon the
basis of these, a total price of $3,238,465.05 was due to
the executrix.    By August 13, 1953, a total of $2,365,000
had been paid, leaving an "unpaid balance . . . [of]
$873,464.05."

The 1952 agreement also provided (a) that Fox, "for the
duration of the escrow agreement, [would] exercise the
rights appertaining to the stock only in such manner as will
maintain . . . [Publishing] as a going concern . . . and
shall vote the stock only so long as there shall be no default" under the 1952 agreement or the escrow agreement,
and (b) that Fox would make "no withdrawals of the assets of" Publishing during the continuance of the escrow
agreement, unless the withdrawals were delivered to the
escrow agent to be applied in reduction of the unpaid bal-

event, upon submission of the result in writing to the parties . . . the same
shall be deemed to be the *conclusive determination of the operating loss.*    However, adjustments shall be made . . . whenever necessary to reflect any changes
in . . . income, expenses or charges allocable to the eight-month period . . .
in so far as the same shall not have been determinable or determined prior to
January 1, 1953. . . .    All such adjustments shall likewise be certified in the
manner provided above . . . and the determination thereof . . . shall be conclusive . . ." (emphasis supplied).

2 The 1952 agreement also provided, "In [the] event of any default in the
payment of the [February 28, 1953] instalment . . . the entire unpaid balance . . . [was] forthwith [to] become due."

Grozier v. Post Publishing Co.

ance. In various respects[3] described more fully in the margin, Fox failed to comply, or to cause Publishing to comply, with these provisions. On August 16, 1956, Publishing filed a voluntary petition in bankruptcy.

The breaches of warranty alleged by Fox related principally (1) to an alleged understatement of severance pay liability in Publishing's balance sheet of December 31, 1951, warranted by the executrix to be "true and complete"; (2) to a failure to disclose "secret agreements" with certain executives and workers; and (3) to alleged inaccuracies in Perkins's statement of the eight-month loss. The trial judge found that the balance sheet as of December 31, 1951, "reflected a normal operation of the exercise of severance of . . . employees." He also found that any losses to Publishing by reason of the so called "secret agreements" amounted only to some $23,000 to $24,000, in the aggregate; that Fox did not give seasonable notice of one group of losses; and that the losses, in any event, were less than the $173,768.28 owed by Publishing to the executrix on an unpaid demand note of August 29, 1952, for a loan made by the executrix after the execution of the 1952 agreement.

The trial judge concluded that Fox was bound by Perkins's determination of the eight-month losses; that the final price to be paid was $3,238,464.05; that because Fox did not make the payment due on February 28, 1953, the entire unpaid balance ($1,552,732.12) then became due; that the December 31, 1951, balance sheet presented a true, com-

---

[3] Publishing failed (a) to pay various taxes for the years 1952 to 1956, (b) to file certificates of condition, (c) to pay its paper supplier, and (d) to pay wages and salaries beginning in May and June, 1956. Fox after he took control had Publishing's "charter . . . amended so that it . . . engaged in many activities . . . unrelated to the newspaper business" and, "[b]eginning on December 31, 1953, Fox withdrew assets . . . without paying them . . . to the [e]scrow [a]gent." Fox also as a stockholder and director in 1955 or 1956 voted to mortgage various substantial assets of Publishing and caused to be granted an option to purchase its assets. The trial judge concluded that Publishing, under Fox's control, "failed to meet its . . . obligations as required by the [1952] contract . . . and jeopardized . . . [its] continuance . . . as a going concern," and that the option agreement, the withdrawal of Publishing's assets, and the various mortgages voted by Fox were violations of the 1952 agreement.

plete statement of Publishing's financial condition at that time; that there was no breach of warranty with respect to Publishing's reserve for severance and death benefits; that Fox failed to give notice of his claim of certain alleged breaches of warranty "with reasonable promptness after acceptance of . . . [Publishing's] stock and . . . business"; and that the executrix is entitled to set off an obligation to indemnify Publishing for about $6,000 to $7,000 against the much larger sum owed to the executrix on Publishing's demand note. The judge also concluded (a) that Fox owed the executrix "$873,464.05 . . . with interest," and (b) that the executrix had performed her obligations under the 1952 agreement and escrow agreement and Fox had not done so.

A final decree was entered (a) enjoining Fox from action no longer of practical importance because of Publishing's bankruptcy, and (b) ordering Fox to pay to the executrix $1,161,052.32. The final decree upon the bill brought by Fox determined (a) that Fox owed State Street $553.37 upon a counterclaim for expenses, and (b) dismissed the bill. Fox has appealed from each decree. The evidence is reported. We consider only questions argued in Fox's brief with adequate clarity. See Rule 13 of the Rules for the Regulation of Practice before the Full Court (1952), 328 Mass. 698; *Lolos* v. *Berlin,* 338 Mass. 10, 13–14.

1. The trial judge correctly ordered Fox to pay the balance of the price with interest. The tentative price of $4,000,000 was to be adjusted (see footnote 1, *supra*) only by the eight-month loss, determined in a particular manner. The trial judge was justified in finding that Perkins finally certified the amount of the eight-month loss, that Fox's accountants negotiated certain adjustments in the amount so determined, and that Fox did not request a review of the determination by Haskins & Sells. That firm in effect had been given final authority to appraise the amount of the loss if the parties did not accept the Perkins determination. See *Eliot* v. *Coulter,* 322 Mass. 86, 89–91. Cf. *Martignette* v. *Sagamore Mfg. Co.* 340 Mass. 136, 138–139. Any re-

quest by Fox for a review by Haskins & Sells had to be made within fifteen days after receipt of Perkins's certification. In the absence of such a request, Perkins's determination thus became "the conclusive determination of the operating loss." The judge could not reasonably have found that this requirement of a request for a review, or any requirement of notice under the 1952 agreement, was ever waived by the executrix. Instead, the evidence indicates that her counsel in all relevant respects insisted upon her strict rights.

The contract did provide (see footnote 1, *supra*) for certain later adjustments of items not "determinable or determined prior to January 1, 1953." Fox argues that Perkins gave no allowance for certain advertising rebates, credits for newspaper returns, and vacation pay, which might affect the eight-month loss. The trial judge was not required to believe testimony that these items were not properly taken into account by Perkins. Indeed, from Perkins's report "that the final net loss . . . [for the eight-month period] is $761,535.95," the most reasonable inference was that the report was complete. It could appropriately be regarded as in effect a certification that Perkins had disposed of all relevant items after proper consideration, particularly in the light of evidence that Perkins's computations had been checked for Fox by his auditing advisers, Leidesdorf & Company, and by one Linton, and that "the final results were approved and accepted by . . . [Linton] as well as by . . . Leidesdorf & Company." The judge could also reasonably rely on testimony, which need not be set out here, that Linton in a letter of February 20, 1953, and Fox in one of April 23, 1953, and in testimony before the Federal Communications Commission in December, 1954, had admitted in effect the propriety of Perkins's determinations (at least so far as not affecting the severance pay reserve).

Fox has failed to establish any basis for any present contest of Perkins's determination. There was no error in the decree that the executrix is now entitled to recover the un-

paid balance of the purchase price fixed pursuant to Perkins's final certificate.

2. In the 1952 agreement, the executrix, among other things, warranted (a) that Publishing's December 31, 1951, balance sheet was "true and complete"; (b) that, except as therein reflected or reserved against, and except for newsprint, labor, and certain executory agreements, Publishing then had no liability of any nature; and (c) that, except for such executory labor and union contracts (among others specified), no commitments extended beyond August 31, 1952. The executrix agreed to indemnify Publishing and Fox "at all times" against any damage from any breach of warranty under the 1952 agreement, excluding, among other items, liabilities (a) reflected in the balance sheet of December 31, 1951, and (b) under labor contracts. The 1952 agreement required that Fox "notify the . . . [executrix] of any liability, claim . . . or deficiency with reasonable promptness." Notices were required to be in writing.

What has already been said about the eight-month loss disposes of Fox's claims for breaches of warranty for items concerning that period. The largest other claim by Fox for breach of warranty relates to severance pay. Claims for severance pay necessarily arose under labor contracts and hence were excluded from the executrix's warranties. Fox, however, seems to argue that the balance sheet of December 31, 1951, misrepresented the liability for severance pay, in that it referred to this contingent liability only by an item, "special reserves . . . $139,294.00," unexplained by any footnote or otherwise. Fox (subject to exception) introduced testimony that on December 31, 1951, employees would have been owed some $1,100,000 for severance pay, death benefits, and pensions, if Publishing had been liquidated on that date. Perkins testified that the reserves were adequate for Publishing as a going concern. Fox bought the stock of Publishing as a going concern. The 1952 agreement required that the balance sheet be "prepared in accordance with generally accepted account-

ing principles consistently followed between 1948 and
1952." Reasonably interpreted, this provision of the
agreement called only for a balance sheet which would re-
flect Publishing's liabilities on a going concern basis in
accordance with its usual accounting methods if those were
consistent with generally accepted principles. The judge
was fully justified in concluding that this standard had been
met; that there was no misrepresentation of the severance
liability; and that Fox's discharges of employees during
his control of Publishing did not represent what was rea-
sonably to be expected under a "normal operation of the
reserve." The judge also was justified (a) in finding that
Fox, in any event, did not question the adequacy of the sev-
erance pay reserves until his testimony before the Federal
Communications Commission in December, 1954, and (b) in
concluding that such a delay of more than two years did not
constitute making claim "with reasonable promptness."

The trial judge in effect found that Publishing was en-
titled to be indemnified by the executrix for about $6,000 to
$7,000 paid by Publishing to one Meyer, a union member
promoted to an executive position. Meyer had been orally
promised, prior to the sale to Fox, his union severance and
death benefits. If proper notice had been given, similar
indemnification would have been due to Publishing for
about $17,000 retirement allowances paid to certain workers
on color presses with whom there had been a pre-sale oral
agreement not to reduce their numbers. These color press
workers were discharged by Fox in 1953. The trial judge,
however, found that no written notice was ever given to the
executrix of this claim. There is no evidence that Fox
himself paid out anything on either the Meyer claim or the
claims of the color press men. There was no error in the
judge's conclusion that the executrix was entitled to set off
(a) the amount owed by her to Publishing to indemnify it
on the Meyer claim against (b) Publishing's much larger
debt to her on its demand note. Fox has not shown that he
himself was entitled to any indemnification by the executrix
on any claim.

Fox's brief does not sufficiently argue any other claims for alleged breach of warranty to require their consideration. There is no merit to his appeal from the decree dismissing his bill.

3. Fox argues that the trial judge erred in allowing interest upon the unpaid balance of the purchase price from February 28, 1953, and that the judge improperly assumed that the whole unpaid balance then became due when Fox failed to pay promptly the instalment due on that day. There was no evidence of a demand for payment by the executrix on or about February 28, 1953, nor of any explicit election by her to accelerate the maturity of then unpaid balances.

The 1952 agreement (see footnote 2, *supra*) did not in terms require any such election to accelerate the later payments in the event of the failure to pay the instalment of price due to February 28, 1953. This part of the agreement purported to call for automatic acceleration in the event of such a default, and was not in what is, perhaps, the more usual form calling for acceleration at the option of the payee. See e.g. *Cassiani* v. *Bellino,* 338 Mass. 765, 768–769. It is to be noted that another section of the 1952 agreement, by contrast, provided that, in the event of a default by Fox continuing for thirty days, the executrix might "instruct the [e]scrow [a]gent . . . to sell the deposited stock."

The provision for acceleration was valid. See *Greene* v. *Richards,* 244 Mass. 495, 497; *General Mortgage & Loan Corp.* v. *Dickey,* 274 Mass. 207, 211–212. Cf. *A-Z Servicenter, Inc.* v. *Segall,* 334 Mass. 672, 676; *Cassiani* v. *Bellino,* 338 Mass. 765, 768–769. The only question is whether it should be interpreted as requiring a demand or other election by the executrix to put such acceleration into effect. Where the issue has been whether the statute of limitations prevents recovery on an instalment obligation, many courts have decided that, before even a seemingly automatic acceleration clause is applied, an affirmative election of the promisee to accelerate the maturity of later payments is

required. See Williston, Contracts (Rev. ed.) §§ 1179A, 2025. See also Chafee, Acceleration Provisions in Time Paper, 32 Harv. L. Rev. 747, 764–776. In other respects, there is a split of authority as to the effect of an automatic acceleration provision absolute in its terms. See Corbin, Contracts, §§ 265, 950, 951, 1059, 1072. The cases are collected in 159 A. L. R. 1077–1097, where it is said that the majority rule is that the provision is not self operative, on the theory that the creditor should have the option to determine when the provision, inserted for his benefit, should become operative. There is, however, a substantial body of decisions which supports the view that the courts should not write a new contract for the parties and should enforce the provision strictly. The question appears to be undecided in Massachusetts.

In *Peter Fuller Enterprises, Inc.* v. *Manchester Sav. Bank,* 102 N. H. 117, 120–121, the New Hampshire Supreme Court had before it notes containing an acceleration clause but with no provision that acceleration would become effective at the option of the obligees. The obligors wished to pay off the notes and tendered the payees the interest due and the unpaid principal of each note. The tender was refused. The obligors then made no more payments and contended that, by their default, the maturity of the notes had been automatically accelerated, a result apparently disadvantageous to the obligees. The court (at p. 121) said that "the better view is that such a clause should be interpreted not as self-operating but as conferring an option on the holder . . . . [M]any . . . loans are made . . . as an investment and the period for which they run can affect the rate of interest and other terms." Under a clause construed as "automatic, the borrower by his own default could convert . . . a five-year mortgage to a sixty-day mortgage. . . . Furthermore . . . in most cases if the clause were self-operating, the holder could not exercise leniency . . . . [S]uch a clause is designed to . . . afford the holder the right to take saving action at the first sign of what appears to him as serious trouble with his invest-

ment.   Such an interpretation is also favorable to the great majority of debtors . . . .''

This reasoning is persuasive.   To treat such a clause as automatic might cause a provision, inserted for the creditor's benefit, to become one for the benefit of the debtor, by enabling the debtor, in effect at his option, to deprive the creditor of a desirable investment.   Similarly such an interpretation would accelerate not only the obligation but also the day when the obligation would be barred by the statute of limitations, a matter all too easily overlooked by a creditor.   We think the rule applied by the New Hampshire court is likely, in most cases, to reach much more equitable results, for debtors as well as creditors, than the other rule, which could operate with gross unfairness in a substantial number of situations.

Nothing in Fox's conduct (see footnote 3, *supra*) entitles him to any special consideration in equity.   He has had the whole benefit of his contract and controlled Publishing from September, 1952, until its bankruptcy.   He committed a material breach of the 1952 agreement at least as early as February 28, 1953.   To be sure, some language in the 1952 agreement would justify interpreting this particular acceleration clause as automatic.   We assume also that an acceleration clause can be phrased in terms so specific that it should be construed literally.   Nevertheless, the present clause does not seem to us to be such a provision.   We apply the majority rule laid down in the New Hampshire case.   There must be reconsideration of the computation of interest.

4.   Fox has argued very briefly and in general terms that the trial judge erred in excluding or admitting various items of evidence.   He has not sufficiently shown any prejudice to him from any such ruling.   No useful purpose will be served by discussing the rulings in detail.

5.   The final decree upon the bill brought by Fox and Publishing is affirmed.   The final decree upon the bill brought by the executrix is to be modified to reflect a recomputation of interest in a manner consistent with this opin-

ion. Interest is to be computed on unpaid balances of principal from the date upon which they were respectively due. The hearing may be reopened solely to permit the executrix to show the date of any demand for, or election to accelerate the payment of, any unpaid instalment of principal due after February 28, 1953. As so modified, the final decree is affirmed. The executrix is to have costs of these appeals, in which she has prevailed on all major issues.

*So ordered.*