BAYBANK MIDDLESEX, as Trustee, and Guardian Life Insurance Company of America, Plaintiffs,

v.

1200 BEACON PROPERTIES, INC., and A. James Derderian, Defendants/Third Party Plaintiffs,

v.

CHARLES CONSTRUCTION COMPANY, INC., and Group One, Inc., Third Party Defendants.

Civ. A. No. 89–2364–C.

United States District Court, D. Massachusetts.

April 1, 1991.

958

Stanley Twarog, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Mass., for Baybank Middlesex and Guardian Life Ins. Co. of America.

Joel Lewin, Dennis M. Ryan, Pamela B. Shapiro, Hinckley, Allen, Snyder & Comen, Boston, Mass., for 1200 Beacon Properties, Inc. and A. James Derderian.

David J. Hatem, Posternak, Blankstein & Lund, Boston, Mass., for Group One, Inc.

Stanley Martin, James J. Myers, Gadsby & Hannah, Boston, Mass., for Federal Ins. Co. and Charles Const. Co., Inc.

## MEMORANDUM

CAFFREY, Senior District Judge.

This case is before the Court on the defendants', 1200 Beacon Properties, Inc. ("1200 BPI" or "Borrower") and A. James Derderian, motion for summary judgment, and the plaintiffs', Baybank Middlesex ("Baybank" or "Trustee") and Guardian Life Insurance Company of America ("Guardian Life"), motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). This action arose out of the financing of the renovation and addition to a hotel located at 1200 Beacon Street, Brookline, Massachusetts (the "Project"). The first Count alleged by the plaintiffs is for breach of contract in connection with its financing of the Project through its purchase of $5,000,000 of tax-exempt Massachusetts Industrial Finance Agency Bonds ("MIFA Bonds" or "Bonds"). The plaintiffs' complaint also contains three additional counts: a Mass. Gen.L. ch. 93A claim, a securities fraud claim for violation of section 10(b) and rule 10b–5 of the Securities and Exchange Act of 1934 (the "Exchange Act"), and a Mass. Gen.L. ch. 231, § 85J claim. Jurisdiction of this Court is founded on the Exchange Act, 15 U.S.C. § 78aa, and pendent jurisdiction. For the reasons stated below, the defendants' motion for summary judgment should be granted, and plaintiffs' motion for summary judgment should be denied.

## I.

For the purpose of these motions, the relevant undisputed facts are as follows. This dispute arose out of a credit transaction that occurred in 1984, between 1200 BPI and Guardian Life, involving the purchase of $5,000,000 in tax-exempt MIFA Bonds which were issued to provide funds to loan 1200 BPI to be used to finance the Project. The plaintiff, Guardian Life, provided part of the financing for the Project through the purchase of MIFA Bonds. The defendant/third party plaintiff, 1200 BPI, was the developer of the Project. The defendant/third party plaintiff, Derderian, was the president of 1200 BPI. The third party defendant, Charles Construction Company ("Charles") was the general contractor for the Project, and the third party defendant Group One, Inc. was the architect.

On May 1, 1984, MIFA issued the Bonds in the principal amount of $6,000,000, pursuant to a Mortgage and Trust Indenture ("Indenture" or "Mortgage") among MIFA, the issuer, 1200 BPI, and Patriot Bank, the trustee.[1] The proceeds from the sale of the MIFA Bonds were provided to 1200 BPI under a Loan Agreement be-

---

1. The plaintiff Baybank succeeded Patriot Bank as the trustee.

tween MIFA and 1200 BPI. The obligations of the borrower, 1200 BPI, under the Loan Agreement and Indenture were insured by ITT Lyndon Property Insurance Company, the surety.

Under the terms of the Indenture and Loan Agreement, to preserve the tax-exempt status of the interest on the MIFA Bonds, the qualifying capital expenditures for the Project could not exceed $10,000,-000 within the three year period prior to and three years after the date the Bonds were issued.

Article VII of the Indenture, and Article IX of the Loan Agreement identify the events of default. The occurrence of an "Event of Taxability" constitutes a default under Section 701(f) of the Indenture and Section 9.1(g) of the Loan Agreement. The Indenture and Loan Agreement define an "Event of Taxability" as:

(a) the inability, at any time, of Hale and Dorr or other nationally recognized bond counsel, to opine (with no qualifications other than those contained in the opinion delivered by Hale and Dorr in connection with the issuance of the Project Bond) that the interest on the Project Bond is not subject to federal income taxation, or (b) the occurrence of Final Determination that the interest on the Project Bond is subject to federal income taxation (excluding, however, such a determination because the Project Bond is or was held for any period by a Substantial User of the Project or a Related Person).

Under Section 702 of the Indenture, the occurrence of an event of default as described above in Section 701 of the Inden-

ture provides for mandatory acceleration of the Bonds by the Trustee in specified circumstances, and in other circumstances the Trustee may only accelerate the Bonds upon the request of the Bondholders and the consent of the Insurer.[2] Upon the occurrence of an "Event of Taxability," Section 702 requires the Trustee to declare all outstanding principal and accrued interest thereon to be due and payable. Section 702 further provides that upon acceleration, interest shall accrue at the existing rate until the Trustee has received all outstanding principal, accrued interest and premium due and payable on the Bonds.

If the MIFA Bonds are accelerated under Section 702 of the Indenture because of a default caused by an "Event of Taxability," Section 203 of the Indenture requires the borrower to pay a "Taxability Premium," regardless of who or what caused the Event of Taxability to occur. Section 203 provides in relevant part:

(i) Upon the occurrence of an Event of Taxability and the acceleration of the Bonds pursuant to Section 702 hereof, a premium in an amount equal to three percent (3%) of the then outstanding principal amount of the Bonds (the "Taxability Premium") shall be and become immediately due and payable on the Project Bond.

(ii) In the event that, subsequent to the occurrence of an Event of Taxability, ... [the] interest on the Bonds is not includable in gross income of any Bondholder, the Bondholders (and/or former Bondholders) shall promptly refund to the Borrower an amount equal to any

---

**2.** Section 702 provides:

*Acceleration.* Upon the occurrence of any event of default as defined in Section 701 hereof, the Trustee shall, upon the written request of the Bondholders or the Insurer with a copy to the Issuer, the Insurer and the Borrower, and only upon the consent of the Insurer (*unless* (a) an event of default has occurred under (i) Section 9.1(a) of the Agreement, (ii) Section 9.1(e) of the Agreement and the Borrower is dissolved or liquidated in connection therewith, or (iii) Section 9.1(h) of the Agreement, *or (b) an event of default has occurred under Section 701(f)* or Section 701(g) hereof, *in any of which events the re-*

*quest of the Bondholders and the consent of the Insurer shall not be required*), *declare the principal of all Bonds then outstanding* (if not then due and payable) *and the interest accrued thereon to be due and payable immediately, and, upon said declaration, such principal and interest shall become and be immediately due and payable.* Pursuant to such declaration, interest on the Bonds shall accrue at the then existing rate to such date as the Trustee shall have received, on behalf of the Bondholders, all principal of and interest and premium due and payable on the Bonds. (emphasis added).

premium paid under Section 203(i) hereof to such Bondholders.

If a default occurs for some reason other than an Event of Taxability, the borrower is not required to pay the three percent Taxability Premium upon acceleration of the indebtedness by the Trustee.

Section 705 of the Indenture, and Section 9.3 of the Loan Agreement, provide that in the event of default, no remedy set forth in the financing documents "is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and in addition to any other remedy." Section 1111 of the Indenture, and Section 10.10 of the Loan Agreement provide that Massachusetts law will govern the construction, validity and performance of the agreements. In addition, the terms of the financing documents do not expressly provide for voluntary prepayment of the indebtedness.

In December 1986, 1200 BPI's accountant certified to 1200 BPI that the cost of the Project was at least $12,014,043, which was $2,000,000 over the capital expenditures cap. Subsequently, on January 22, 1987, by means of a letter from its accountant, 1200 BPI notified its bond counsel, Hale and Dorr, that the qualifying capital expenditures for the Project had exceeded the $10,000,000 cap. Hale and Dorr then issued a letter dated January 28, 1987, stating that it could no longer opine that the MIFA Bonds were exempt from federal income tax.[3]

Upon receipt of Hale and Dorr's opinion letter on March 19, 1987, the Trustee, pursuant to Section 702 and 203 of the Indenture, on March 19, 1987, accelerated the Bonds and demanded that all amounts due under the MIFA Bonds, including accrued interest, principal, and the three percent Taxability Premium be paid. (Plaintiffs' Complaint, ¶ 15; Spencer Affidavit, ¶ 8). On March 20, 1987, in response to the acceleration, 1200 BPI tendered to the Trustee all the outstanding principal and accrued interest on the MIFA Bonds. 1200 BPI also paid the three percent Taxability Premium as provided under Section 203 of the Indenture.

Plaintiffs then in October 1989, more than two years after the default and acceleration of the MIFA Bonds, commenced this action against the defendants seeking to recover as damages the sum of the difference between the contract rate of interest and the prevailing rate of interest on a similar grade investment, over the remaining period of the loan, discounted to present value.[4]

## II.

The defendants have moved for partial summary judgment as to Counts I, II, and IV of the plaintiffs' complaint, pursuant to Fed.R.Civ.P. 56(c).[5] The plaintiffs have also moved for summary judgment as to Count I, the breach of contract claim. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598,

---

**3.** Although the Trustee and Guardian Life were indicated as addressees of the January 28th letter, there is a dispute as to whether they actually received the letter prior to March 19, 1987. (Derderian Affadavit, ¶ 13; Dougherty Affadavit, ¶ 2).

**4.** Plaintiffs allege they suffered actual damages in the amount of $1,219,468.

**5.** The defendants also filed a motion to strike the affidavit of H. Joseph Hameline, submitted by the plaintiffs in support of their motion. The defendants argue that Hameline's affidavit lacked sufficient foundation. The Court agrees that Hameline lacked the requisite knowledge to assert the facts of the nature set forth in his affidavit. Thus, the defendants' motion to strike should be granted. Hameline's affidavit, however, even if the motion to strike were denied, would not have affected this Court's consideration of the motions.

1608, 26 L.Ed.2d 142 (1970). The moving party may satisfy this burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Only after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact does the party opposing the motion bear the burden of responding. *Id.* at 321, 106 S.Ct. at 2552; *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. The opposing party may not rest upon the mere allegations or denials in its pleading, but must respond with affidavits or otherwise to show the existence of a genuine issue for trial. Fed.R.Civ.P. 56(e); *Adickes*, 398 U.S. at 159–60, 90 S.Ct. at 1609–10. A dispute about a material fact is a "genuine issue" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In light of this standard, this Court shall examine the cross motions for summary judgment.

■ The parties' dispute in this case is basically one of contract interpretation. It is well-settled under Massachusetts law that the interpretation of a contract is generally a question of law. *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir. 1981); *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970); *Daley v. J.F. White Contracting Co.*, 347 Mass. 285, 288, 197 N.E.2d 699 (1964). Where the wording of a contract is unambiguous, the contract must be enforced according to its terms. *Freelander*, 357 Mass. at 516, 258 N.E.2d 786. If the contract contains ambiguities, however, a question of fact for the jury may be presented. *Gillentine v. McKeand*, 426 F.2d 717, 721 (1st Cir.1970); *Trafton v. Custeau*, 338 Mass. 305, 307–08, 155 N.E.2d 159 (1959). The determination of whether the terms of a contract are ambig-

uous is a question of law. *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir.1989) (contract terms are considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed"); *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987).

■ In interpreting a contract, the court must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible. *Shea v. Bay State Gas Co.*, 383 Mass. 218 at 224–25, 418 N.E.2d 597 (1981); *Massachusetts Turnpike Auth. v. Perini Corp.*, 349 Mass. 448, 452, 208 N.E.2d 807 (1965). A contract must also be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose. *See J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789, 795, 494 N.E.2d 374 (1986); *McMahon v. Monarch Life Ins. Co.*, 345 Mass. 261, 264, 186 N.E.2d 827 (1962). In other words, a contract must not, whenever possible, be construed so as to render any of its terms meaningless. *See Shea v. Bay State Gas Co.*, 383 Mass. 218, 225, 418 N.E.2d 597 (1981). Thus, the Loan Agreement, and the Mortgage and Trust Indenture, having been executed contemporaneously in the course of one transaction, are to be construed together in order to ascertain the terms of the contract made by the parties. *See Baker v. James*, 280 Mass. 43, 46, 181 N.E. 861 (1932); *Charlestown Five Cents Sav. Bank v. Zeff*, 275 Mass. 408, 411, 176 N.E. 191 (1931).

Applying these rules of construction to the contract provisions in question, this Court finds that the provisions are only reasonably susceptible to one interpretation. The first step is to examine the specific language of the provisions at issue. The first argument raised by the defendants is that Section 203 of the Indenture, providing for a three percent taxability premium, is a liquidated damages clause which provides the plaintiffs with their exclusive remedy in the event the Bonds become taxable. In response, the plaintiffs argue

that such an interpretation of Section 203, would render Section 705 of the Indenture and Section 9.3 of the Loan Agreement meaningless. The plaintiffs point out that Sections 705 and 9.3 provide that, upon default, no one remedy is intended to "be exclusive of any other remedy." Thus, according to the plaintiffs, in addition to the principal, accrued interest and the three percent premium already paid by the defendants, they are also entitled to recover benefit of the bargain damages.

Section 203 of the mortgage is entitled "Effect of Event of Taxability" and provides that "upon an Event of Taxability and the acceleration of Bonds pursuant to Section 702 hereof, a premium in the amount equal to three percent of the then outstanding principal of the Bonds shall be and become immediately due and payable on the Project Bond." It is undisputed by the parties that an "Event of Taxability" did occur as defined by the Indenture and Loan Agreements. It is also undisputed that this event constituted an event of default under Section 702(f) of the Indenture and that as a result the Trustee exercised its right to accelerate the indebtedness under Section 702, the acceleration provision of the Indenture.

▆▆▆▆ Under Massachusetts law where actual damages are "difficult to ascertain" and where the sum agreed upon by the parties "represents a reasonable estimate of the actual damages" the liquidated damages provision will be enforced. *See, e.g., Colonial at Lynnfield, Inc. v. Sloan*, 870 F.2d 761, 764–65 (1st Cir.1989); *A–Z Servicenter, Inc. v. Segall*, 334 Mass. 672, 675, 138 N.E.2d 266 (1956); *Lynch v. Andrew*, 20 Mass.App.Ct. 623, 627, 481 N.E.2d 1383, *review denied*, 396 Mass. 1102, 484 N.E.2d 102 (1985); *Renda v. Gouchberg*, 4 Mass.App.Ct. 786, 786, 343 N.E.2d 159 (1976). In order to determine whether the liquidated damages provision is valid, this Court must examine the reasonableness of the liquidated damages provision, both retrospectively, and at the time the parties agreed to it. *See Colonial*, 870 F.2d at 765 & n. 7. If the stipulated damages are "unreasonable and grossly dispro-

portionate to the real damages" that resulted from the default, the provision will be deemed unenforceable as a penalty. *A–Z Servicenter*, 334 Mass. at 675, 138 N.E.2d 266.

▆▆▆▆ In this case, this Court finds that the Taxability Premium of three percent is reasonable and enforceable as liquidated damages in the event that the Bonds become taxable for any reason. The tax-exempt status of the interest enhances the real return to the Bondholders. Moreover, due to the varying tax positions of the Bondholders, the actual damages suffered as a result of the taxability of the interest is difficult to ascertain both upon a retrospective appraisal and at the time of the parties' agreement. Section 203 was also negotiated at arm's length between adequately represented parties of equal commercial sophistication. Thus, the Taxability Premium is reasonable in light of the decrease in the bond yield the Bondholders will receive as a result of the taxability of the interest.

▆▆▆▆ A liquidated damages clause does not, however, preclude other remedies available at law or equity, absent the clear intention of the parties to the contrary. *See North Am. Consol., Inc. v. Kopka*, 644 F.Supp. 191, 193 (D.Mass.1986); *De Blois v. Boylston & Tremont Corp.*, 281 Mass. 498, 518, 183 N.E. 823 (1933). *See generally* Knapp, Commercial Damages: A Guide to Remedies in Business Litigation, § 9A.05[4] (1988). It is the parties' intention, as expressed through the terms of the contract, that is controlling. *See North American*, 644 F.Supp. at 193. Therefore, a court will permit recovery under alternative remedies where the intention of the parties as expressed through the terms of the contract liquidates some but not all of the damages.

▆▆▆▆ In this case, plaintiffs argue that Sections 705 of the Indenture and 9.3 of the Loan Agreement, which specifically provide "that no one remedy is exclusive," is a clear statement that the parties did not intend that Section 203 would be the sole remedy available to the plaintiffs upon de-

fault. Section 705 of the Indenture provides in relevant part:

> *Other Remedies; Rights of Bondholders.* If any event of default at any time shall have occurred and be continuing, the Trustee may pursue any available remedy to enforce the payment of principal of and premium, if any, and interest on the Bonds then outstanding.
>
> .　　.　　.　　.　　.
>
> No remedy by the terms of this Indenture conferred upon or reserved to the Trustee (or to the Bondholders) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Trustee or to the Bondholders hereunder or now or hereafter existing.
>
> .　　.　　.　　.　　.

The plain meaning of this section allows the plaintiffs to pursue any remedy provided under the agreement, at law or equity, in order to recover any amount that is due under the terms of the agreement. This provision evidences the parties' intent that the plaintiffs would not be limited to any particular remedy or legal theory to enforce the defendants' payment of the principal, premium, and outstanding interest due on the Bonds.[6] These nonexclusivity provisions relied on by the plaintiffs, interpreted in such a manner as to give effect to the other provisions of the agreements, were intended solely to allow the plaintiffs to pursue all remedies available in order for them to recover the amount owed by the defendants under the express terms of the Indenture and Loan agreement. Sections 705 and 9.1 do not, however, allow the plaintiffs to pursue damages that were clearly not contemplated by the parties. Thus, this Court finds that, although Section 203 of the Indenture is a valid and enforceable liquidated damages provision, it does not preclude the plaintiffs from resorting to alternative remedies in order to collect what obligations are owed on the Bonds.

The next issue this Court must address is what damages the plaintiffs are entitled to under terms of the Indenture and Loan Agreement upon default, and acceleration. The resolution of this issue requires the Court to address what effect the plaintiffs' acceleration of the indebtedness had on their right to damages. The plaintiffs argue that in addition to the principal, accrued interest and the Taxability Premium, that they are entitled to the common law breach of contract remedy of the benefit of the bargain.[7] The plaintiffs contend that such benefit of the bargain damages should be calculated as the interest yield between the contract rate and the market rate at the time of repayment, projected over the term of the loan, discounted to present value. The defendants argue, however, that the financing agreements expressly provided that upon acceleration of the debt by the plaintiffs, the maturity date of the indebtedness is accelerated to the present, thus limiting the plaintiffs' recovery exclusively to principal, accrued interest, and the Taxability Premium.

At common law, in the absence of an express provision allowing for prepayment, a presumption exists that the borrower does not have the unilateral right to retire a mortgage debt or other fixed obligation prior to the maturity of the loan. *See Trahant v. Perry,* 253 Mass. 486, 489, 149 N.E. 149 (1925) (lender is under no obligation to accept payment of principal and interest prior to maturity); *Renda,* 4 Mass.App.Ct. at 786, 343 N.E.2d 159 (same); *see also Houston N. Hosp. Proper-*

---

**6.** Similarly, Section 9.3 of the Loan Agreement entitled "No Remedy Exclusive" provides that "[n]o remedy herein ... is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute."

**7.** Guardian Life also objects to the prepayment of the Bonds, and has not accepted the funds from the Trustee. (Spencer Affidavit, ¶ 14). The parties do not dispute, however, the fact that the indebtedness was accelerated pursuant to Section of the Indenture, and that the Trustee accepted payment by the defendants of the then outstanding principal, interest and premium. (Doughtery Affidavit, ¶¶ 3, 4).

*ties v. Telco Leasing, Inc.*, 680 F.2d 19, 22 (5th Cir.1982); *Westminster Investing Corp. v. Equitable Assurance Society of the United States*, 443 F.2d 653, 657 (D.C. Cir.1970); *McCausland v. Bankers Life Ins. Co. of Nebraska*, 110 Wash.2d 716, 757 P.2d 941, 944 (1988). A borrower, therefore, may not relinquish or retire voluntarily a debt before maturity without paying principal and interest for the full term of the note. The inclusion of a term restricting prepayment or requiring the payment of a prepayment penalty are two methods commonly used by a lender to preclude borrowers from refinancing loans in times of declining interest rates.[8]

It is well-settled, however, that there are some limitations upon the right of a lender to receive unearned interest or a prepayment premium on a fixed debt obligation. *See, e.g., In Re LHD Realty Corp.*, 726 F.2d 327, 329–30 (7th Cir.1984) (lender has no right to a prepayment premium when a mortgage is satisfied by a "government exercising its power of eminent domain" or from "destruction of the mortgaged property through an insured against casulty such as fire"); *Grozier v. Post Publishing Co.*, 342 Mass. 97, 106–07, 172 N.E.2d 266 (1961) (creditor loses its right to future or unearned interest when it elects to accelerate the maturity of the debt); *A–Z Servicenter*, 334 Mass. at 677, 138 N.E.2d 266 (upon acceleration the "debt will not be enforced as to future interest"); *Stilian v. GTC Corp.*, 17 Mass.App.Ct. 953, 953, 457 N.E.2d 677 (1983) (same).

■ One such limitation is that a lender loses its right to receive unearned or future interest when it elects to accelerate the maturity of a debt. *See Grozier*, 342 Mass. at 106–07, 172 N.E.2d 266; *A–Z Servicenter*, 334 Mass. at 677, 138 N.E.2d 266; *Lammerding v. Shawmut Community*

*Bank, N.A.*, 13 Mass.App.Ct. 601, 603–04, 435 N.E.2d 1066 (1982); *see also LHD Realty*, 726 F.2d at 330; *Slevin Container Corp. v. Provident Fed. Sav. & Loan Ass'n*, 98 Ill.App.3d 646, 54 Ill.Dec. 189, 191, 424 N.E.2d 939, 941 (1981); *Peter Fuller Enters., Inc. v. Manchester Sav. Bank*, 102 N.H. 117, 152 A.2d 179, 181 (1959); *Eyde Bros. Dev. v. Equitable Life Assurance Society of the United States*, 697 F.Supp. 1431, 1436 (W.D.Mich.1988); *George H. Nutman Inc. v. Aetna Business Credit, Inc.*, 115 Misc.2d 168, 453 N.Y.S.2d 586, 587 (Sup.Ct.1982). *See generally* Alexander, *Mortgage Prepayment: The Trial of Common Sense*, 72 Cornell L.Rev. 288, 323–26 (1987). This is so because, absent some express agreement to the contrary, acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment, but instead is payment made after maturity. *See LHD Realty*, 726 F.2d at 330–31; *Grozier*, 342 Mass. at 106–07, 172 N.E.2d 266; *A–Z Servicenter*, 334 Mass. at 676, 138 N.E.2d 266. Upon acceleration, the borrower is not choosing to pay early; he is forced to pay because the debt has become due. Thus, when lenders accelerate the maturity of the debt, they waive their opportunity to earn, and their claim to, interest payable over a period of years in exchange for the immediate payment of the outstanding principal and accrued interest. *See LHD Realty*, 726 F.2d at 331.

■ The plaintiffs argue that if acceleration precludes a lender's claim to future interest because the loan does not run to maturity, it will cause borrowers to default intentionally to trigger acceleration in order to avoid liability for the unearned interest and to take advantage of declining market interest rates.[9] In *Grozier v. Post*

---

**8.** Prepayment premiums compensate a lender for the anticipated interest he or she will not receive if a loan does not run to maturity, either through default and acceleration or by voluntary prepayment, depending on the exact terms of the particular prepayment clause. This protects the lender against the loss of his or her bargain if interest rates decline. Accordingly, courts have upheld reasonable prepayment penalties. *See, e.g., In Re LHD Realty Corp.*, 726

F.2d 327, 330 (7th Cir.1984); *Eyde Bros. Dev. Co. v. Equitable Life Assurance Society*, 697 F.Supp. 1431, 1436 (W.D.Mich.1988); *In Re A.J. Lane & Co.*, 113 B.R. 821, 825–27 (Bankr.D.Mass.1990); *McCausland*, 757 P.2d at 944–45; *Renda*, 4 Mass.App.Ct. at 786, 343 N.E.2d 159.

**9.** In the present situation, this seems implausible given the ramifications of an event of default on the defendants due to an event of taxability, for they are ultimately responsible, as the

*Publishing Co.*, the Massachusetts Supreme Judicial Court considered this very issue raised by the plaintiffs. 342 Mass. at 105–07, 172 N.E.2d 266. In *Grozier*, in an attempt to avoid the harsh effect of an automatic acceleration clause in depriving the creditor of a desirable investment, the court held that the acceleration clause in question was not self-operative and that the creditor should have the option to determine when the acceleration provision, inserted for his benefit, should become operative. The court did, however, make clear that acceleration provisions are valid and enforceable and that an "acceleration clause can be phrased in terms so specific that it should be construed literally" as to compel acceleration upon default. *Id.* at 105, 107, 172 N.E.2d 266; *see also Eyde Bros.*, 697 F.Supp. at 1436; *Meisler v. Republic of Texas Sav. Ass'n*, 758 S.W.2d 878, 883 (Tex.1988) (due to the harsh nature of acceleration "any contractual provision for acceleration of an indebtedness, in order to be effective, must be clear and unequivocal"); *Peter Fuller Enter.*, 152 A.2d at 181–82. Thus, although courts will construe an ambiguous acceleration clause in favor of allowing the lender the option to accelerate, when the terms are clear and unambiguous, the provision will be enforced according to its terms.

██ In this case, this Court concludes that based on the language of the financing documents and the governing law, after the maturity of the debt had been accelerated by the plaintiffs as required under Section 702 due to a default as a result of an Event of Taxability, the plaintiffs were no longer entitled to the unearned interest on the Bonds or any portion thereof. Section 702 clearly indicates the parties' intent that upon a default due to an Event of Taxability the Trustee is required to declare all outstanding principal, accrued interest and premium due and payable immediately. Therefore, once the maturity date of the obligation was accelerated and the outstanding principal, accrued interest, and the Taxability Premium was tendered in full by the defendants, the plaintiffs received their benefit of the bargain as contemplated by the parties under the specific terms of the agreement.

Other provisions of the financing documents further support the Court's interpretation that upon acceleration and payment of the amount due, pursuant to Section 702 of the Indenture, the plaintiffs would have recovered the benefit of the bargain, and that the defendants' obligations under the contract would be fully discharged. For example, Section 507 of the Indenture entitled "Nonpresentment of Bonds" provides that the Bondholders' recourse against the Trustee is limited to the amount of principal, accrued interest, and premium paid on the Bonds, and that the Bondholders shall be "restricted exclusively to such funds for any claim of whatever nature on his or her part under this Indenture or on, or with respect to such Bonds." Similarly, Section 601 of the Indenture provides for defeasance of the lien securing the Bonds after the Trustee has received from the borrower all the outstanding principal, premium and interest that is due.[10]

---

developers, for the additional expenses incurred in the construction of the Project. Furthermore, the borrower would run the risk of not being able to repay the loan upon acceleration, which may result in the loss of their investment through foreclosure and credit rating.

**10.** Section 601 of the Mortgage provides in relevant part:

*Defeasance.* When the Issuer has paid or has caused to be paid to the holders of the outstanding Bonds the principal and interest and premium, if any, due or to become due thereon at the times and in the manner stipulated therein and herein and all fees and expenses of the Issuer and of the Trustee and other bond expenses have been paid, then the lien of this Indenture on the Trust Estate shall terminate and the Trustee shall promptly execute and deliver to the Borrower and the Issuer an appropriate discharge hereof....

. . . . .

*All the outstanding Bonds shall be deemed to have been paid within the meaning of this Section when the Trustee shall hold,* in trust for and irrevocably committed thereto, *sufficient cash* or direct obligations issued by the United States of America, with maturities and interest rates adequate to produce sufficient cash, (1) to prepay the Bonds in whole at the earliest date permitted or required by Sections 301 or 303 hereof; or (2) *to pay any principal and premium, if any, and interest on the Bonds which may be due,* or overdue and

Thus, these provisions further demonstrate the parties' intent that upon default, the plaintiffs' recovery would be limited to those damages specifically provided under the terms of the agreements.

The Private Placement Memorandum ("PPM") also clearly sets forth what damages the Bondholders may expect to recover in the event of default. The PPM states that upon the occurrence of certain events of default, one of which includes an event of taxability, the Trustee is required to accelerate the maturity of the Bonds which would result in the Bonds being retired in advance of their stated maturity date. (PPM, pp. 3–5). The PPM then specifically details the amount to be paid by the defendants in the event of a default due to taxability, as "an amount equal to 100% of the principal amount of the Bonds plus accrued interest to the date of redemption [acceleration], plus a redemption premium equal to 3% of the principal amount of the Bonds so redeemed." (PPM, pp. 4–5). Therefore, the specific language of the financing documents, taken as a whole, clearly reflects the intent of the parties to limit damages, upon acceleration of the debt by the Trustee due to an event of taxability, to those specifically enumerated under Sections 203 and 702 of the Indenture.

▆ The plaintiffs next argue that the defendants breached various representations, warranties, and covenants contained in the agreements relating to the tax-exempt nature of the financing.[11] Section 9.1(c) of the Loan Agreement, incorporated by reference in Section 701(c) of the Indenture, specifically provides that upon failure by the Borrowers to observe or perform any covenant or condition contained in the financing documents for a period of 30 days after they have received written notice by the Trustee, their actions will constitute a default under section 701 of the Indenture and Section 9.1 of the Loan Agreement.[12] Section 9.2 of the Loan Agreement entitled "Remedies on Default" provides that "[i]f the Borrower fails to observe or perform any covenant, condition, agreement or provision ... whether or not the Borrower is in default under this Agreement or the Indenture ... the Trustee may perform such covenant or condition" and the "Borrower shall pay the reasonable cost of any action taken and reimburse any payment made." Section 9.2(c) further provides that upon acceleration of the indebtedness, the Issuer may take any action "at law or equity" that is necessary "to collect the loan payments then due" or "to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this agreement." The plain meaning of these provisions, interpreted as a whole, allow the plaintiffs to take any action necessary to enforce the defendants' compliance with their obligations under the terms of the agreements in the event the defendants are in breach of one of the covenants. In this case, the plaintiffs do not even allege that they incurred any additional expenses to compel the defendants' compliance with the covenants in question or that they performed any such obligation on behalf of the defendants. Therefore, even if the defendants were in breach of the covenants as alleged by the plaintiffs, this breach would result

---

to make all remaining payments of principal and premium, if any, and interest on the Bonds as they come due.

. . . . .

(emphasis added).

**11.** The plaintiffs allege that the defendants breached Sections 2.2(i), 2.2(k), 3.1, and 7.4 of the Loan Agreement.

**12.** Sections 9.1(c) and (d), incorporated by reference in Section 701(c) of the Mortgage, also provide that a default will occur under the Indenture and Loan Agreement upon the "[f]ailure by the Borrower to observe or perform any

other covenant, condition or agreement on its part to be observed or performed in the Financing Documents ... for a period of thirty days after written notice to it by the Trustee" or the "material inaccuracy or incompleteness of any representation or warranty made in writing or any statement by or on behalf of the Borrower in connection with the transactions contemplated by the Financing Documents." Therefore, under the terms of the agreements, breach of any covenant or condition by the Borrower will result in an event of default under Section 701 of the Indenture, and Section 9.1 of the Loan Agreement.

in, at most, a default under Section 701 of the Indenture and 9.1 of the Loan Agreement, but would not entitle the plaintiffs to any additional damages.[13]

Despite the unambiguous language of the Indenture and Loan Agreement, the plaintiffs contend that they are entitled to the benefit of the bargain damages as a result of the defendants' default. Plaintiffs argue that such damages are properly calculated as the difference in the interest yield between the contract rate and the market rate at the time of prepayment, projected over the remaining term of the loan, discounted to present value. To support their position the plaintiffs cite *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 626 F.Supp. 1229, 1231 (S.D.N.Y.1986), *appeal dismissed*, 816 F.2d 670 (2d Cir. 1987). This case, however, provides no support for the damages asserted by the plaintiffs, because *Teachers Insurance* concerned the breach of a Commitment Letter the terms of which expressly provided that upon breach of any covenant or condition of the agreement that the lender would have the right to "claim and receive all provable damages, including loss of the bargain, sustained by [the lender] as a result of such default." *Id.* at 1236. Thus, in *Teachers Insurance*, unlike the present case, the agreement illustrated the clear intention of the parties that the lender would be entitled to all damages suffered as a result of the borrower's default.

Plaintiffs also cite *Renda v. Gouchberg* and *In Re A.J. Lane & Co.* to support their position. *Renda* has virtually no applicability to the case at bar, because the contract in *Renda* also expressly provided for a prepayment penalty of "one half of the interest that would have been paid from the date of prepayment to the end of the term," in the event of voluntary prepayment by the borrower. *See Renda*, 4 Mass.App.Ct. at 786, 343 N.E.2d 159. Similarly, *A.J. Lane* does not assist the plaintiffs. 113 B.R. 821, 823 (Bankr.D.Mass. 1990). In *A.J. Lane*, the borrower sold the mortgaged property and voluntarily prepaid the lender bank the outstanding balance of the principal and accrued interest due under the notes. The bank, however, never exercised its option to accelerate the indebtedness as a result of the borrower's default caused by the sale of the property. The bank then demanded that the borrower pay the prepayment penalty that was specifically provided for under the terms of the notes. In response to the lender's demand, the defendant in *A.J. Lane* argued to the bankruptcy court that his payment was involuntary because the sale of the property constituted a default under the terms of the note. *Id.* at 826. The court rejected the borrower's argument and stated that "[p]ayment of course does not cause acceleration, and the Bank took no action which constituted the exercise of any right to accelerate it may have had." *Id.* at 826–27. The *A.J. Lane* court then examined the merits of the prepayment penalty as a liquidated damages provision and held that it was unenforceable in light of the bank's anticipated or actual loss from prepayment. *Id.* at 828–30. Thus, all three cases cited by the plaintiffs in support for their claim for damages are inapposite, for in each case, the contract contained specific provisions that provided for the amount of damages to be awarded.

In this case, the plaintiffs received the benefit of the bargain when the defendants tendered the full amount the parties agreed would be due upon the occurrence of an Event of Taxability. They received the full amount of damages that was contemplated by the parties as expressed under the terms of the agreement. Acceptance of the plaintiffs' construction of the financing documents would produce a result unreasonable in the commercial context in which the parties acted. *See Ucello v. Cosentino*, 354 Mass. 48, 52, 235 N.E.2d 44 (1968).

13. In light of this Court's interpretation of the Indenture and Loan Agreement, the issue of whether the defendants actually were in breach of the covenants or representations relating to the tax-exempt nature of the financing is not determinative, because the parties admit that an event of default occurred under the terms of the agreements. The fact that another default may have been caused by the defendants as a result of a breach of one or more of the covenants contained in the agreements would not entitle the plaintiffs to any additional damages.

Both parties involved in this transaction were adequately represented by counsel, sophisticated in tax-exempt bond financing, and in positions of equal bargaining power. This Court finds nothing in the terms of the agreements to warrant the additional damages which the plaintiffs seek. Such a radical departure from the reasonable expectation of the parties and the express terms of the agreement is unwarranted in the absence of a clear expression in the contract. *See Shea,* 383 Mass. at 224–25, 418 N.E.2d 597.

The plaintiffs could have assured itself of receiving what it alleges to be the "benefit of the bargain" in a number of ways. First, the plaintiffs could have bargained for an optional acceleration clause upon an event of taxability, and then refused to accelerate the indebtedness upon default and collected payments as they became due or negotiated with the borrower for an additional premium to allow for voluntary prepayment. Second, the parties could have expressly provided for such a contingency in their agreement. For example, the plaintiffs could have included a provision in the agreement that provides if the notes are accelerated upon default, the tender by the borrower of an amount to satisfy the indebtedness shall be considered a voluntary prepayment and in order to satisfy the amount due, the tender must also include the difference between the interest on the contract note and interest in a comparable loan over the remaining contract term, reduced to present value. *See Meisler,* 758 S.W.2d at 884. The inclusion of such a provision in the Indenture would have entitled the plaintiffs to the damages they now seek. Thus, although lenders customarily have a variety of methods at their disposal to ensure recovery of their anticipated long-term return under a fixed interest obligation in the event of default, the plaintiffs in this case failed to avail themselves of them.

After a review of the record, there is no issue of material fact regarding the interpretation of the Indenture and Loan Agreement or the obligations of the respective parties under the terms of these agreements. Thus, the defendants' motion for partial summary judgment should be granted on Count I of the plaintiffs' complaint, and plaintiffs' motion for summary judgment should be denied.

### III.

■ Plaintiffs' next claim against the defendants arises under Mass.Gen.L. ch. 93A, section 11, alleging that the defendants engaged in unfair and deceptive trade practices. According to Count II of plaintiffs' complaint, the defendants made numerous knowing and willful misrepresentations "in connection with the financing" and the "execution of the construction contract which immediately caused the relevant capital expenditures to exceed the Capital Expenditure Cap." In addition, defendants failed to "notify any party of this occurrence for two years."

■ In opposing the defendants' motion on this issue, the plaintiffs have not submitted any additional facts beyond the conclusory allegations and assertions that the defendants made "knowing and willful misrepresentations" regarding the amount of the Project's anticipated capital expenditures. These statements are clearly insufficient to defeat the defendants' motion for summary judgment. Plaintiffs must provide supporting facts and "concrete particulars" which would show the existence of a genuine issue of material fact for trial. *See Adickes v. S.H. Kress & Co.,* 398 U.S. at 159–60, 90 S.Ct. at 1609; Fed.R.Civ.P. 56(e). The mere possibility that a factual dispute may exist, without more is not sufficient to overcome a presentation by the moving party. *See id.;* Local Rule 56.1. Plaintiffs have offered no evidence beyond the mere allegation in their complaint on the issue of the defendants' alleged misrepresentation of capital expenditures.[14] Consequently, defendants' motion for summary

---

14. This Court also notes that plaintiffs have failed to submit a memorandum of law in opposition to the defendants' motion for summary

judgment on Counts II and IV of the plaintiffs' complaint (the chapter 93A and 231 claims). *See* Local Rule 56.1.

judgment as to Count II of the plaintiffs' complaint should be granted.

## IV.

Last, Count Four of the plaintiffs' amended complaint alleges a violation of Mass.Gen.L. ch. 231, section 85J. The defendants contend that this Count should be dismissed because section 85J applies only to "sellers of property." Under Massachusetts law it is well-settled that to be held liable under section 85J, a defendant must have actually sold "personal property" within the meaning of the statute. *See, e.g., Hamed v. Fadili*, 408 Mass. 100, 102, 556 N.E.2d 1020 (1990) (section 85J applies to fraud in connection with the sale of securities); *Briggs v. Carol Cars, Inc.*, 407 Mass. 391, 394–95, 553 N.E.2d 930 (1990) (section 85J applies to fraud in connection with the sale of automobiles); *see also Medlinsky v. Kidder, Peabody and Co.*, No. 88–1757–Mc, 1989 WL 10737 (D.Mass. Feb. 8, 1989) (Lexis, Genfed library) (section 85J applies to fraud in connection with broker selling securities out of its own inventory); *Morgan v. Financial Planning Advisors, Inc.*, 701 F.Supp. 923, 927 (D.Mass.1988) (section 85J does not apply to fraud in connection with the sale of services, not property); *Abelson v. Strong*, 644 F.Supp. 524, 535 (D.Mass.1986) (same); *Arent v. Shearson/American Express Inc.*, 633 F.Supp. 770, 775 (D.Mass.1985) (same).

In the present case, the plaintiffs have failed to allege that the defendants sold any property at all; therefore, the defendants' actions are not covered under the terms of the section 85J. Accordingly, plaintiffs' Count IV should be also be dismissed.

For all the reasons stated above, defendants' motion for summary judgment should be granted as to plaintiffs' Count I, II, and IV, and plaintiffs' motion for summary judgment as to Count I should be denied.

Order accordingly.