William G. COLL, Plaintiff–Appellant,

v.

PB DIAGNOSTIC SYSTEMS, INC., Defendant–Appellee.

No. 94–1680.

United States Court of Appeals, First Circuit.

Heard Dec. 6, 1994.

Decided March 30, 1995.

---

David Rapaport, with whom Rapaport & Rapaport, was on brief, for appellant.

Scott C. Moriearty, with whom Laurie F. Rubin and Bingham, Dana & Gould, were on brief for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

This appeal comes to us on the basis of diversity jurisdiction. The parties agree that it is governed by the substantive law of the state of Massachusetts. The plaintiff is the former chief executive officer of the defendant corporation, and his claims stem from an alleged breach of his employment agreement with the defendant. Specifically, the plaintiff maintains that the district court improperly granted the defendant's summary judgment motion because there were genuine issues of material fact as to whether 1) the defendant breached its agreement to create a long-term incentive plan and communicate its goals to the plaintiff; 2) the doctrine of promissory estoppel required that the defendant create a long-term incentive plan; 3) the defendant fired the plaintiff in bad faith, in order to deprive him of a benefit to which he was entitled; and 4) the defendant deceived the plaintiff concerning its intention to establish a long-term incentive plan. For the following reasons, we *affirm* the district court's grant of summary judgment.

## I. BACKGROUND

Plaintiff William G. Coll ("Coll") sued defendant PB Diagnostic Systems, Inc. ("PB") in the United States District Court for the District of Massachusetts. Coll asserted various claims regarding PB's alleged promise to develop a long-term incentive bonus program in connection with Coll's employment as PB's Chief Executive Officer ("CEO"). After extensive discovery, the court granted PB's motion for summary judgment.

Although the parties heatedly dispute many of the issues on appeal, the facts central to our inquiry are largely uncontroverted.[1] The defendant, PB, was founded in 1985 to develop and market medical diagnostic instruments. PB was started as a joint venture owned in equal shares by Polaroid Corporation ("Polaroid") and a German company called Behringwerke, A.G. ("Behring"). In 1987, PB representatives contacted the plaintiff, Coll, and informed him that PB was

looking for a CEO to run the start-up company.

### A. *Pre-hire statements*

Coll agreed to an interview to discuss the position, and met with PB Board Chairman Peter Kliem ("Kliem") and Polaroid's Donald Fronzaglia ("Fronzaglia") at the Pillar House restaurant. Coll expressed concern that PB would not be able to offer him an equity share in the company because it was a "50/50" joint venture. Kliem confirmed that PB could not offer an equity share in the company, but explained that PB intended to create a Long Term Incentive Plan ("LTIP") that would give the CEO the opportunity to earn up to $1,000,000 provided that PB met certain performance goals. Kliem indicated that PB did not yet have the LTIP in place, but that the company looked forward to developing it with the new CEO. In his deposition, Coll admits that he understood this to mean that any payout under the LTIP would be contingent upon the achievement of yet-to-be-defined performance goals. Coll also testified that he understood that PB had not yet extended him an employment offer.

### B. *The offer letters*

After meeting with several other PB representatives, Coll determined that he was interested in managing PB. On December 4, 1987, Kliem sent Coll a letter offering Coll the CEO position at PB (the "First Offer Letter"). The First Offer Letter set forth the salary and annual bonus to be paid Coll, and further stated: "It is our intent, that in 1989, we would jointly engage in establishing criteria to appropriately reflect your direct contribution to the success of the venture in 1990." Coll called Fronzaglia and expressed his concern that the First Offer Letter did not adequately address the LTIP or what would happen in the event that the venture failed.

In response to Coll's concerns, Kliem sent Coll another offer letter, dated December 14, 1989 (the "Second Offer Letter"). This letter stated:

> Issue, the remainder coming from our scrutiny of the exhibits and depositions.

1. Much of the factual background recited here comes from PB's Statement of Material Facts Concerning Which There Is No Genuine Triable

As we have discussed, we are pleased to confirm our offer of employment as General Manager, PB Diagnostic Systems, Inc. (PBDS, Inc.)....

You will be an employee of PBDS, Inc. at a starting salary of $160,000.00 per year, with a guaranteed bonus of $40,000.00 per year for 1988 and 1989, payable on your first and second anniversary of employment. You must be an employee of PBDS, Inc. on those dates to receive payment of these bonuses.

*During 1989, we intend to jointly explore with you appropriate methods of compensation to reflect your contribution to the success of the venture in 1990 and beyond.*

In the event PBDS, Inc. initiates your termination of employment in the period between your employment date and December 31st, 1989, PBDS, Inc. will provide you one year's base salary.

Further, in the event of your separation, for any reason, you will refrain from working directly or indirectly for a competitor in the field of medical diagnostics for a period of one year. This provision, of course, will not apply if PBDS, Inc. has chosen to cease this joint venture.

For purposes of administration only, Polaroid Corporation will provide benefits in areas of medical and dental insurance, life insurance and 401K savings plans.

We are enthusiastic about your contribution and leadership as we look forward to the long-term success of PBDS, Inc.

(emphasis added).

After Coll received the Second Offer Letter, he telephoned Fronzaglia and accepted the offer. During this conversation, Fronzaglia said: "Does that take care of it?" Coll replied, "You and I understand what it is, so I guess it's O.K." Coll admitted in his deposition that at that time he believed that the Second Offer Letter incorporated all the terms and conditions of his employment, and that he believed that there was no material difference between the First and Second Offer Letters with regard to the LTIP.

## C. *Coll's tenure at PB*

In October 1988, the PB Board of Directors formed a Compensation Committee to develop compensation packages for PB's senior executives. In April 1989, the Compensation Committee developed an executive compensation proposal which included an Annual Bonus Plan and a LTIP. The proposal, which was shown to Coll prior to being presented to the Board of Directors, included a payout package that gave Coll the opportunity to earn over $1,000,000 in incentive compensation.

On April 20, 1989, PB's Board of Directors met and unanimously approved both the Annual Bonus Plan and the LTIP. Payout under the LTIP was contingent upon the achievement of certain long term goals, described in the LTIP as:

Milestones as developed by PBDS in accordance with the business plan and subject to approval of the Board. Evaluation of business progress made by the Board prior to the 1992 and 1994 payouts.

On July 18, 1989, in response to the Board's request, Coll submitted a written memorandum suggesting payout milestones for the LTIP:

The Board of Directors has approved conceptually a LTIP for PBDS senior staff (7 persons). The Board has also approved specific funding for this Plan, ⅓ payable in 1992 and ⅔ payable in 1994. Per your request, we have considered targets appropriate to such a long term plan and our recommendation follows.

Since the Annual Bonus Plan has targets approved each year which are tactical and short-term in nature, we believe that the company's interests can be best served by emphasizing strategic and results-oriented goals in the Long Term Plan.

For 1992 (year end), criteria should include
—entrance into US market
—entrance into European market
—profitability
—positive cash flow
Criteria for 1994,
—profitability at "x" level or better

—internal rate of return at "y%" or better

I look forward to discussing with you the utilization of these strategic goals.

PB claims that in October 1989, its Board of Directors considered and approved the goals proposed by Coll for the LTIP. The relevant minutes from this meeting read: "Various compensation and incentive matters were discussed and approved."

In April 1990, Coll presented his revised five-year business plan for PB, projecting "profitability" and "positive cash flow" by the end of 1992. A year later, it became clear that PB would not meet the profitability and positive cash flow goals embodied in the revised five-year plan. To the contrary, PB suffered tremendous losses in the years 1989, 1990, 1991, and 1992. On April 4, 1991, Coll wrote to the Compensation Committee, proposing to lower the original goals of the LTIP:

> This memo will address several issues related to the [LTIP] and to the discussion points raised at the Compensation Committee meeting on March 27, 1991. . . .
>
> 1. *The goals originally established for the 1992 payout of the [LTIP] are conceptually satisfactory.* The goal of "entrance into the US market" is already met and the goal of "entrance into the European market" is well underway. Perhaps the more critical goals are, however, "profitability" and "positive cash flow." I believe that we should use the concepts of profitability and positive cash flow, but that we should look at these numbers not as absolute dollar amounts within absolute time-frames, but as measures of progress against marketplace, product and business goals. To state that "our goal is to become profitable and to have positive cash flow by Q4, 1992" is an excellent tool to motivate managers and their organizations and we have communicated profitability and cash flow goals and responsibilities to our employees. . . .
>
> Certainly, we will not use these tools indiscriminately and without the concurrence of the Board. Further, we agree that we must continuously show positive results in profitability and cash flow. As a result, the management should be mea-

sured against its ability to deliver positive profitability on the incremental shipments/revenue that are made in 1992.

> . . . .

> Therefore, my recommendations for the goals are
>
> —entrance into US market
>
> —entrance into European market
>
> —25% operating profit on incremental 1991 to 1992 revenues

> . . . .

(emphasis added).

PB's Board of Directors was scheduled to meet on September 5, 1991. Just prior to this meeting, Coll submitted a lengthy memo in which he again proposed to lower the targets of the LTIP. He informed the Board that the current targets of the LTIP were unattainable and that, therefore, the LTIP was unlikely to create the desired incentives. He urged the Board to lower the targets of the LTIP so that there would be a potential in 1992 for payout under the LTIP. In pertinent part, the memo read as follows:

> Background: In 1989 the Board approved the basic Long Term Incentive (LTI) plan concepts, including the split of goals to effect 1992 and 1994 payments. At that time, the targets for 1992 were suggested to be:
>
> —entrance into US market
>
> —entrance into European market
>
> —profitability
>
> —positive cash flow

> . . . .

> Half of the goals cited above will not be met. . . . Profitability and positive cash flow are now forecast for 1993, not 1992.

> The retentive and motivational capabilities of the LTI are therefore compromised for 1992, and the original reason the Compensation Committee had for designing a 1992 payment was to "keep people interested."

> The dilemma therefore is do we *keep a plan that in its current construct is unlikely to fulfill its purpose?*

Do we keep the original plan or do we review other options?

. . . .

(emphasis added).

At its September 5, 1991, meeting, the Board considered Coll's proposal and rejected it. The minutes of that meeting read as follows:

A management proposal to replace the Company's Long–Term Incentive Plan was considered. The existing Plan appears unlikely to produce incentive compensation payments under the Company's present business forecasts. The management proposed replacing the plan with one that would provide realistic incentives to the Company's management.

... Directors pointed out the inadvisability of lowering the objectives of an incentive plan to match lowered performance expectations. . . .

After further discussion, the Board did not accept the proposal to modify the current plan. The Board approved in principle the adoption of a successor long-term incentive compensation plan for later years, with the prospect of a one-third payout in 1993 and a two-thirds payout in 1995.

### D. *Coll's termination*

On January 14, 1992, Coll's employment at PB was terminated by unanimous decision of the Board of Directors. PB wrote Coll, explaining that the sponsor companies—Polaroid and Behring—were disappointed with PB's business performance. Nevertheless, the letter explained, because Coll's termination was due in part to corporate restructuring, PB would pay Coll one year's salary as a lump sum severance payment, in accordance with his employment contract. Moreover, the letter continued, "in the unlikely event of a payout under the long term bonus plan, you will be eligible for participation on a pro-rated basis." PB never achieved the two of the four goals originally proposed by Coll to be the 1992 targets of the LTIP.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo* and read the record in a light most favorable to the non-moving party, drawing all inferences in the non-moving party's favor. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993), cert. denied, —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Essentially, Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party "may not rest upon the mere allegations or denials of the ... pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

We have advocated a cautious approach to summary judgment motions where issues of motive and intent must be resolved. *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 109 (1st Cir.1988). Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

## III. DISCUSSION

### A. *The Contract Claim*

The crux of Coll's breach of contract claim is that PB breached its agreement to implement a long-term incentive plan. He further alleges that the parties' agreement required PB to communicate to Coll the goals on which the incentive bonuses would be premised, and that PB failed to do so.

■ To recover damages for breach of contract at trial, Coll would have been required to demonstrate (1) that the parties reached a valid and binding agreement with regard to the LTIP; (2) that PB breached the terms of this aspect of his employment contract; and (3) that he suffered damages from the breach. To survive PB's summary judgment motion, Coll was required to put forth competent evidence on each of these issues.

The district court offered alternate holdings in support of its summary judgment ruling against Coll. As one basis, the district court held that Coll's employment agreement did not obligate PB to create and implement a LTIP but, rather, was only a non-binding "agreement to agree." As an alternative basis, the district court found that, even assuming that the parties reached a binding agreement regarding the LTIP, PB had not breached it. The court held that the contract merely obligated PB to "jointly explore ... appropriate methods of compensation to reflect [Coll's] contribution to the success of the venture in 1990 and beyond," and that PB had fulfilled this obligation.

■ The pertinent law is well settled. "Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 993 (1st Cir. 1992) (quoting *Edmonds v. United States,* 642 F.2d 877, 881 (1st Cir.1981) (citing *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 516, 258 N.E.2d 786, 788 (1970))). "Only if the contract is ambiguous is there an issue of fact for the jury." *Id.* (citing cases). "Moreover, where the contract is unambigu-

ous, it is to be enforced according to its terms." *Id.* (citing cases). In the absence of fraud or mistake, an agreement is presumed to express the intent of the parties. *Id.* (citing *Hess Oil & Chemical Corp. v. Ristuccia,* 3 Mass.App.Ct. 772, 772, 331 N.E.2d 823, 823 (1975)).

■ "Evidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract." *Fairfield 274–278 Clarendon Trust,* 970 F.2d at 993 (citing *New England Financial Resources, Inc. v. Coulouras,* 30 Mass.App.Ct. 140, 145, 566 N.E.2d 1136, 1139 (1991) (parol evidence rule precludes use of oral evidence to modify integrated agreement)). Moreover, "parol evidence may not be used to 'create ambiguity where none otherwise exists.'" *Rey v. Lafferty,* 990 F.2d 1379, 1385 (1st Cir.) (quoting *Boston Car Co. v. Acura Auto. Div., American Honda Motor Co., Inc.,* 971 F.2d 811, 815 (1st Cir.1992), *cert. denied,* ―― U.S. ――, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993)). Instead, "parties are bound by the plain terms of their contract," *Hiller v. Submarine Signal Co.,* 325 Mass. 546, 550, 91 N.E.2d 667, 669 (1950), and their subjective contemplations are immaterial where the agreement is unambiguous. *Blakeley v. Pilgrim Packing Co.,* 4 Mass.App.Ct. 19, 24, 340 N.E.2d 511, 514 (1976).

■ Language within a contract "is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken." *Rey,* 990 F.2d at 1384. "Where possible, words should be given their natural meaning, consistent with the tenor of contractual terms." *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1084 (1st Cir. 1989).

Of course, the parol evidence rule only applies where the parties have created a partially or completely integrated document. Restatement (Second) of Contracts § 213.[2]

---

2. "(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsis-

tent with them. (2) A binding completely integrated agreement discharges prior agreements to

An integrated agreement is a writing that constitutes a final expression of one or more terms of an agreement. *See id.* § 209. "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." *Id.; see also Ryder v. Williams,* 29 Mass.App.Ct. 146, 150, 558 N.E.2d 1134, 1136 (1990).

With regard to long-term incentive compensation, Coll's employment contract contains the following language: "During 1989, we intend to jointly explore with you appropriate methods of compensation to reflect your contribution to the success of the venture in 1990 and beyond." Coll maintains that this language embodies a previously reached agreement on the subject and thus obligated PB to develop a LTIP, establish clear and reasonable goals for the plan, and communicate those goals to Coll. He relies on his contractual negotiations as evidence that PB intended to obligate itself to create a LTIP that would provide Coll with the opportunity to earn at least $1,000,000 in incentive compensation. To prevail on this theory, Coll initially must show either (1) that his employment contract with PB was not an integrated agreement with respect to incentive compensation, or (2) that the contractual language is consistent with his assertions. We think he has done neither.

■ All the relevant evidence indicates that the employment contract was an integrated and final expression of the parties' agreement with respect to compensation matters. The agreement lists Coll's base salary, his annual bonus, his severance compensation, and a non-competition agreement. In short, the face of the document contains nothing that would indicate that the parties did not intend it to be a complete and final

expression of their rights and obligations. Moreover, Coll admitted in his deposition that he thought at the time that the contract embodied all the material terms and conditions of his employment. Given these considerations, we find that Coll's employment agreement was an integrated document subject to the tenets of the parol evidence rule, and as such must be enforced according to its terms unless the terms are ambiguous on their face.

■ Coll asserts that the relevant contractual language is ambiguous and should be submitted to the jury to determine whether it obligated PB to develop a LTIP and communicate its goals to Coll. We disagree. The clear language of the contract states only that PB "intend[s] to jointly explore with [Coll] appropriate methods of compensation." Any ambiguity in this language centers around whether it obligates PB to do *anything.* Assuming it creates a binding obligation,[3] the language clearly does not support Coll's assertions. To turn the words "we intend to jointly explore appropriate methods of compensation" into a binding obligation to develop, fund, and implement a LTIP that would provide up to $1,000,000 of incentive compensation would be completely at odds with the common and natural meaning of the words. Rather, we assume that the parties intended what they wrote: that PB intended to make a good faith effort to explore an appropriate compensation package for Coll, including incentive bonuses.

The evidence presented for summary judgment demonstrates clearly that PB fulfilled this obligation. Not only did it explore new incentive packages, it developed and funded a LTIP plan for Coll and his senior executives. And although Coll disputes the point, the evidence shows that Coll himself proposed the plan's goals, which PB failed to meet under his stewardship. Under these circumstances, there was no breach of contract and

the extent that they are within its scope." Restatement (Second) of Contracts § 213.

**3.** As we stated above, the district court held that the parties had merely created a non-binding agreement to agree with respect to long-term compensation. For the purposes of this appeal, we assume arguendo that the language is binding, and base our analysis on whether PB breached its contractual obligations. Because we conclude that there was no breach, we need not address whether the employment contract was in fact binding regarding long-term compensation or whether it was, as the district court found, merely a non-binding agreement to agree.

summary judgment on that claim was certainly appropriate.

### B. *The promissory estoppel claim*

■ As an alternative to his contract claim, Coll argues that he is entitled to damages on the basis of promissory estoppel. Specifically, Coll alleges that during contract negotiations PB promised to develop a LTIP in order to persuade Coll to accept the CEO position at PB. The district court rejected Coll's promissory estoppel claim, holding that Coll could not have reasonably relied on the pre-hire discussions regarding the LTIP. We agree.

■ "An element of promissory estoppel is that the party invoking it must have *reasonably* relied on the alleged promise to his detriment."[4] *Hall v. Horizon House Microwave*, 24 Mass.App.Ct. 84, 506 N.E.2d 178, 184 (1987) (emphasis added). Where a written statement conflicts with a prior oral representation, reliance on the oral representation is generally held to be unreasonable. *See Trifiro v. New York Life Insurance Co.*, 845 F.2d 30, 33–34 (1st Cir.1988) ("The conflicting content of [the defendant's] oral statement with [his] written statement ... should have placed [the plaintiff] on notice that he should not rely on either statement."). As this Court has noted,

> [c]onfronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying. A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained. Explicit conflict engenders doubt, and to rely on a statement the veracity of which one should doubt is unreasonable. The law does not supply epistemological insurance. Nor does it countenance reliance on one of a pair of

contradictories simply because it facilitates the achievement of one's goal. *Id.*

In a case similar to the one at bar, an employee sought entitlement to stock options allegedly promised him during compensation-package negotiations with his employer. *Hall*, 506 N.E.2d at 184. In rejecting the promissory estoppel claim, the court held that "[g]iven the extended and persistently inconclusive nature of his negotiations ... about an over-all employment and compensation package, [the plaintiff] could not have had more than a well founded hope that the stock option aspect of the deal would work out satisfactorily for him. Inchoate negotiations are no better basis for reliance than for an action on the purported contract as such." *Id.* (citing *Tull v. Mister Donut Dev. Corp.*, 7 Mass.App.Ct. 626, 389 N.E.2d 447 (1979)).

■ Assuming arguendo that PB in fact promised Coll that it would create a LTIP worth $1,000,000, Coll could not have reasonably relied on it. Coll's employment offer was clearly at odds with his understanding of PB's prior oral representations regarding long-term compensation. Upon receipt of the First Offer Letter, Coll called PB and raised his concern that the language in the offer did not seem to obligate PB to create a LTIP that could pay him up to $1,000,000.[5] When the Second Offer Letter essentially rephrased the same noncommittal language contained in its predecessor, Coll should have been aware that there was a potential disagreement over the LTIP. Nevertheless, Coll acquiesced to the language in the Second Offer Letter, purportedly because he did not want PB to think that he did not trust them. He cannot now second-guess his negotiating strategy and claim the benefit of a bargain he did not negotiate. As we discussed above, the language in the Second

---

4. "The theory of promissory estoppel, as embodied in the Restatement [(First)] of Contracts § 90 (1932), permits recovery if (1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Loranger Construction Corp. v. E.F. Hauserman*

*Co.*, 6 Mass.App.Ct. 152, 154, 374 N.E.2d 306, 308, *aff'd*, 376 Mass. 757, 384 N.E.2d 176 (Mass. 1978) (citations omitted).

5. The First Offer Letter stated, in pertinent part: "It is our intent, that in 1989, we would jointly engage in establishing criteria to appropriately reflect your direct contribution to the success of the venture in 1990."

Offer Letter clearly did not obligate PB to do anything more than explore the feasibility of a LTIP. Moreover, Coll admitted that, despite the concerns he had raised, he recognized that the terms of the offer letters were essentially identical regarding long-term compensation. In short, PB's refusal to "firm up" the language regarding long-term compensation rendered any reliance on prior oral representations unreasonable. Accordingly, we affirm the district court's grant of summary judgment for PB on Coll's promissory estoppel claim.[6]

### C. The bad-faith-termination claim

Lastly, we turn to Coll's claim that PB fired him in bad faith in order to deprive him of a benefit to which he was entitled.

 Under Massachusetts law, the implied covenant of good faith and fair dealing prohibits an employer from terminating an employee in order to deprive him of a benefit to which he is entitled. *Fortune v. National Cash Register, Inc.*, 373 Mass. 96, 364 N.E.2d 1251, 1257 (1977). Essentially, "[a]n employer may not discharge an employee in order to ... reap for itself financial benefits due [the] employee." *Maddaloni v. Western Mass. Bus Lines, Inc.*, 386 Mass. 877, 438 N.E.2d 351, 356 (1982) (citing *Fortune*, 364 N.E.2d 1251). An employer's obligation of good faith and fair dealing imposes liability for the loss of compensation clearly related to an employee's past service when that employee is discharged without good cause. *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 27–29 (1981). As we noted in *Biggins*,

> [T]he *Gram* court was careful to distinguish between recovery based on the employee's loss of future wages for past services, and any claim for recovery based on loss of future income for future services. The Massachusetts Supreme Judicial Court explicitly limited this theory of "wrongful discharge" to situations in which the employee's discharge without good cause deprives the employee of compensa-

tion for services previously earned or past services.

*Biggins v. Hazen Paper Co.*, 953 F.2d 1405, 1416 (1st Cir.1992) (discussing *Gram*, 429 N.E.2d at 27–29). *Fortune* liability does not encompass situations where the employee merely was fired arbitrarily. *Id.* Rather, in order to establish a claim of wrongful termination, the plaintiff must demonstrate that his discharge was "contrived to despoil [him] of earned commission or similar compensation due for past services." *Id.*

 In the present case, we do not find that Coll's termination deprived him of any particular benefit to which he was entitled. Coll contends that because his termination occurred just as he was "pressing [PB's Board] to define the goals of the LTIP," there is a genuine issue as to whether the Board terminated him to avoid paying him nearly $1,000,000 under the LTIP. Brief for Appellant at 44. The undisputed facts do not support this contention. Coll's own writings indicate that two of the four goals of the LTIP would not be met, and that there was thus no potential for payout in 1992 under the LTIP: "Half of the goals ... will not be met.... Profitability and positive cash flow are now forecast for 1993, not 1992. The retentive and motivational capabilities of the LTI are therefore compromised for 1992...." The Board's minutes echo this: "A management proposal to replace the Company's Long-Term Incentive Plan was considered. The existing Plan appears unlikely to produce incentive compensation payments under the Company's present business forecasts." Accordingly, we agree with the district court that Coll's termination did not strip him of compensation due for past services, and affirm the dismissal of Coll's wrongful termination claim.

We have considered the other issues raised by Coll and find them equally meritless.

*Affirmed.*

---

6. Coll's claim for deceit also fails because, like promissory estoppel, it requires that the plaintiff demonstrate reasonable reliance. *See Trifiro,*

845 F.2d at 33–34. Accordingly, we affirm the district court's summary judgment ruling on this issue as well.