Fremont-Smith, J.
On August 18, 1995, an administrative magistrate for the Division of Administrative Law Appeals (“DALA”) reversed the Division of Capital Planning & Operation’s (“DCPO”) decision to deny TLT Construction Company’s (“TLT”) request for approval of a contract modification to cover additional costs of asbestos abatement at the Roxbury District Court. In reversing DCPO, the administrative magistrate found that DCPO’s contract for the containment and removal of asbestos from the courthouse was ambiguous, that TLT’s interpretation of DCPO’s ambiguous contract was reasonable, and held that TLT was entitled to a contract modification in the amount of $108,700. DCPO now seeks judicial review of DALA’s decision pursuant to G.L.c. 30A, §14, and moves to vacate DALA’s award of Change Order No. 30, as TLT and DALA’s interpretation of DCPO’s asbestos abatement contract was incorrect as a matter of law.
BACKGROUND
A. Procedural Background:
On August 2, 1993, DCPO awarded TLT Construction Corporation State Project No. JSB90-4 for renovations to the Roxbury District Courthouse. (R.A.,[1] 72-94.) The initial phase of TLT’s general contract with DCPO required TLT to remove all asbestos containing material (“ACM”) from the courthouse. (Section 02055, R.A., 20-48.) On July 6, 1993, TLT subcontracted with Coastal Energy, Inc. (“Coastal”), an asbestos abatement contractor, to remove all ACM from the courthouse. (R.A., 108-110.) Coastal’s asbestos abatement subcontract with TLT was for $317,000. (R.A., 108-110.)
Following the completion of asbestos abatement, on December 28, 1993, TLT submitted Change Order No. 30, in the amount of $108,700.00, to DCPO, based on the final quantities of ACM removed from the courthouse. (R.A., 11.) DCPO rejected TLT’s request for change order No. 30 on March 29, 1994. (R.A., 10.) Following DCPO’s rejection, TLT appealed to the Commissioner of DCPO for reconsideration on July 15, 1994. (R.A., 4.) The Commissioner rejected TLT’s appeal by letter, dated, August 17, 1994. (R.A., 4.)
TLT appealed to DALA on September 1, 1994, for review of DCPO’s refusal to issue Change Order No. 30. (R.A., 5.) An appellate hearing was held on April 7, 1995, before Kimberly Fletcher, Administrative Magistrate for DALA. (R.A., 129-261.) At the hearing, Administrative Magistrate Fletcher (“Fletcher”) heard the testimony of Ronald Bussier, from Coastal, and of William DuLong, from DCPO. The witnesses testified regarding the interpretation of DCPO’s asbestos abatement contract. (R.A., 129-261.) Following the hearing, Fletcher reversed DCPO’s refusal to issue Change Order No. 30 and awarded TLT $108,700. (R.A., 11.) In issuing her decision, Fletcher made, inter alia, the following factual findings:
9. The cost of constructing the three-room decontamination unit called for on page 26 of Section 02055 is the same whether one square foot or 1,000 square feet of asbestos is removed.
10. The cost to remove asbestos depends on the amount of insulation on the outside diameter of the pipe, not just the size of the pipe. (R.A., 115-119.)
From the facts, Fletcher drew the following conclusions:
Mr. Bussier’s interpretation that the “base bid” of Section 02055 represented only the containment cost of the abatement process was reasonable, Mr. Bussier’s interpretation that ACM removal costs were to be paid to the contractor pursuant to the unit price section was reasonable, and that the ambiguiiy created by DCPO was to be held against DCPO, the drafter of the agreement. (R.A., 115-119.)
Following Fletcher’s grant of Change Order No. 30, DCPO petitioned for rehearing and reconsideration on August 29, 1995. (R.A., 120-125.) DALA granted a rehearing on September 29, 1995. (R.A., 126.) Following rehearing, Fletcher made one additional finding of fact:
11. Included in the base bid was the amount of $43,200.00, representing the total amount of nine (9) separate unit price amounts.
Subsequently, Fletcher affirmed her decision to reverse DCPO’s refusal to issue Change Order No. 30. (R.A., 126-128.) DCPO now seeks judicial review of DALA’s decision pursuant to G.L.c. 30A, §14.
B. Contractual Background:
Section 02055 of the general contract between TLT and DCPO governs asbestos removal from the courthouse. (R.A., 20.) Initially, the contract sets forth:
Asbestos Abatement Contractor shall furnish all labor, materials, equipment, and services for the removal and disposal[2] of specified asbestos-containing materials from the Roxbury District Court. (Section 02055 at Section 1.01(B), R.A., 20.)
*312 Section 02055 also governs the scope of asbestos abatement to be performed at the courthouse, as well as the submission of bids to DCPO for the removal of all asbestos-containing material (“ACM”). Further, Section 02055 directs the estimating contractor to the unit price section, Section 01025, for adjustments to the scope of ACM removed from the courthouse.
Under the “scope” section, the contract requires the asbestos abatement contractor to:
remove and dispose of all ACM and specified non-ACM, prepare work areas, remove and dispose of all insulating materials located in the work area, decontaminate all surfaces and piping containing ACM, perform all necessary demolition to access hidden ACM, decontaminate and clean-up following removal activities, re-insulate all piping, etc., furnish all labor and materials, and comply with all state and federal laws. (Section 02055 at Section 1.02(A)(1-11), R.A., 21.)
In submitting estimates for asbestos abatement, Section 02055 provides at Section 1.13(A):
Bids shall not be based solely on the information provided. Asbestos Abatement Contractor shall make their own estimate of the amount of material to be removed, decontaminated, cleaned and disposed. Bids and cost of the work to be performed shall be based on the Asbestos Abatement Contractor’s own estimate of the work required. The amounts identified in this Section and on sketches represent the scope of work for the base bid. Any amount of material beyond or below the indicated scope of work shall be addressed using the unit price schedule to add to or deduct from the base bid amount.
Additionally, Section 1.13(B) provides:
ACM identified on the sketches is meant as a guide to the Asbestos Abatement Contractor in order to facilitate the Asbestos Abatement Contractor’s determination of the work and amount of ACM to be removed. Quantities and descriptions shown on the sketches are for information only and may not indicate the actual location and/or quantity of all ACM required to be removed by Asbestos Abatement Contractor under this Section.
Finally, Section 1.13(C) provides:
Asbestos Abatement Contractor is required to remove all ACM from Roxbury Distrtct Court specified within the scope of work for this Section.
In short, Section 1.13(A-C) requires the asbestos abatement contractor to examine the specifications “identified in this section” and the “sketches” in order to ascertain the scope of asbestos abatement for the base bid. The base bid encompasses the removal of all ACM, as identified above in Section 02055. (R.A., 20-23.)
As a component of the base bid, the phrase “identified in this Section” refers to the estimated quantities of ACM identified in Section 02055 at Section 1.02(B)(1-5). (R.A., 21-23.) This Section identifies the type, location, and expected quantities of ACM to be removed from the courthouse. For example, Section 1.02(B)(1)(a and c) provides:
The following is a description of each work area to be abated with approximate quantities of ACM. Asbestos Abatement Contractor is responsible for removing all ACM from each work area.
1. Basement Areas — Sallyport (Garage) and Bottom of Stairwell A:
a. Total Isolation removal of all ACM, including: pipe fitting insulation, pipe flange/valve insulation, VAT and mastic, flexible duct connectors and debris. The limit of ACM removal is indicated on the sketch. (Note: there is VAT and mastic in the elevators, which also must be removed.)
c. There is approximately 500 square feet of VAT and mastic, 70 ACM insulated pipefittings, 5 ACM insulated pipe valve/flanges, and 1 flexible duct connector in the basement.
To supplement the iype, location, and approximate quantities of ACM identified above in Section 1.02(B)(1-5), Section 1.13(A), the estimate section, also instructs the asbestos abatement contractor to examine the “sketches” in order to facilitate a base bid estimate of ACM to be removed from the courthouse. (R.A., 45-48, and 105.) The sketches indicate the size and approximate location of ACM to be removed from the courthouse.
Having completed the base bid, Section 02055 directs the asbestos abatement contractor to:
Refer to Section 01025 “Unit Price Section” for any additions or deductions to the scope of work to be performed under this Contract. This section contains unit price work. (Section 02055 at Section 1.01(F), R.A., 20.)
Under Section 01025, the general contractor must submit unit price estimates for various phases of the renovation, including asbestos abatement. Unit price estimates reflect the contractor’s unit cost to perform a unit aspect of work. Within the unit price Section, DCPO identifies each unit aspect of work, provides the estimated quantify of units, and requires the contractor to estimate its unit cost to perform one unit of the specific aspect of work. (Section 01025, R.A., 15-18.) Unit price estimates must be submitted, as a whole, into Item One of the general contract.[3]
The purpose of the unit price section is to permit additions and/or deductions to the overall scope of work performed under the general contract based on hidden or unknown quantities of work that may exist, and unit pricing permits the general contractor a variance of up to 100 percent of the estimated quantity of units identified by DCPO in the unit price section. (Section 01025 at Section 1.02(F), R.A., 15.) Therefore, *313 any variance above or below the scope of work estimated in the base bid is to be resolved by using the unit price section. (Section 02055 at Section 1.13(A), R.A., 28.) The units of variance are multiplied by the contractor’s unit price cost and submitted to DCPO in the form of a change order. Change orders adjust the contract price upon DCPO approval. (Section 01025 at Section 1.02(H), R.A., 15.)
DISCUSSION:
The party appealing an administrative decision, pursuant to G.L.c. 30A, §14, may appeal therefrom to the Superior Court and bears the burden of demonstrating the invalidity of the decision on appeal. Merisme v. Board of Appeals on Motor Vehicle Liability Policies & Boards, 27 Mass.App.Ct. 470, 474 (1989). Under G.L.c. 30A, § 14, this Court may affirm, remand, set aside, or modify an agency’s decision if it is determined that a party’s substantial rights were prejudiced because the decision was: (1) in violation of constitutional provisions, (2) in excess of statutory authority or jurisdiction of the agency, (3) based on an erroneous interpretation of the law, (4) made upon unlawful procedure, (5) unsupported by substantial evidence, or (6) arbitrary or capricious. G.L.c. 30A, §14(7). See Pyramid Co. of Hadley v. Architectural Access Bd., 403 Mass. 126, 130 (1988); Winn v. Architectural Access Bd., 25 Mass.App.Ct. 41, 42 (1987).
In reviewing an agency’s decision, the court is required to give due weight to the agency’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992). The reviewing court may not substitute its judgment for that of the agency. Southern Worcester County Regional Vocational School Dist. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982). Rather, judicial review is permitted only as to questions of whether the commission’s decision involves an error of law or is unsupported by substantial evidence. School Com. of Stoughton v. Labor Rel. Com’n., 4 Mass.App.Ct. 262, 266 (1976); Selectmen of Truro v. Outdoor Advertising Bd., 346 Mass. 754, 758 (1964).
To the extent that an agency finding is one of fact, it must stand unless “unsupported by substantial evidence.” Raytheon Co. v. Director of Div. of Employment Security, 364 Mass. 593, 595 (1974). Substantial evidence is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. On the other hand, to the extent that an agency determination involves a question of law, it is subject to de novo judicial review. Id. However, a court may not overturn an administrative agency’s choice between two conflicting views, even though the court justifiably would have made a different choice had the matter come before it de novo. Zoning Bd. of Appeals v. Housing Bd. of Appeals, 385 Mass. 651, 657 (1982).
As grounds for appeal, DCPO contends: (1) TLT and DALA interpreted the asbestos abatement contract incorrectly as a matter of law, (2) DCPO’s asbestos abatement contract is not ambiguous, (3) even if DCPO’s asbestos abatement contract were ambiguous, TLT was obligated to make reasonable inquiry to resolve any such ambiguity, and (4) the money value of Change Order No. 30 is incorrect.
DCPO’s contentions raise a question of contract interpretation, and it is well settled in Massachusetts that the interpretation of a contract ordinarily is a question of law for the court. Den Norske Bank AS v. First Nat. Bank of Boston, 75 F.3d 49, 52 (1st Cir. 1996); Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995); BayBank Middlesex v. 1200 Beacon Properties, Inc., 760 F.Supp. 957, 963 (D.Mass. 1991). Contractual interpretation is subject to de novo review by a reviewing court. Zoning Bd. of Appeals, supra, at 657.
When interpreting a contract, the court must “give effect to the parties’ intentions and construe the language to give it reasonable meaning wherever possible.” BayBank Middlesex v. 1200 Beacon Properties, Inc. 760 F.Supp. 957, 963 (D.Mass. 1991). Also, a contract “must [] be interpreted as a whole, and effect must be given to all of its provisions in order to effectuate its overall purpose.” Id.
Where the wording of a contract is found to be unambiguous, the contract must be enforced according to its terms. BayBank Middlesex v. 1200 Beacon Properties, Inc. 760 F.Supp. 957, 963 (D.Mass. 1991); Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) (where the contract is unambiguous, it is to be enforced according to its terms); Den Norske Bank AS v. First National Bank of Boston, 75 F.3d 49, 52 (1st Cir. 1996) (should the court find a contract to be unambiguous, it should be interpreted according to its plain terms). However, “[if] the contract language is ambiguous, on its face or as applied, contract meaning normally becomes a matter for the fact finder." Den Norske Bank AS, supra.
Whether a contractual ambiguity exists is a question of law for the court. Wyner v. North American Specialty Insurance Co., 78 F.3d 752, 754 (1st Cir. 1996); BayBank Middlesex v. 1200 Beacon Properties, Inc. 760 F.Supp. 957, 963 (D.Mass. 1991). “Contract terms are considered ambiguous ‘where an agreement’s terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed.’" BayBank Middlesex, supra. See: Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., 767 F.Supp. 363, 370 (D.Mass. 1991) (a contract is considered ambiguous where the terms used can reasonably support differing interpretations). However, a contract is not rendered ambiguous simply because the parties may disagree about its meaning. Id.
Applying these rules of construction to the contract provisions here, the first inquiiy is to determine whether the specific provisions of the contract are *314 ambiguous. DCPO contends, according to the plain language of the contract, that Section 02055 requires the asbestos abatement contractor to submit a base bid estimate for the containment and removal of all ACM from the courthouse. In support of its argument, DCPO cites to Section 02055 at Section 1.02(A)(1-11), which outlines the scope of asbestos abatement work to be performed at the courthouse, and requires the asbestos abatement contractor to:
remove and dispose of all ACM and specified non-ACM, prepare work areas, remove and dispose of all insulating materials located in the work area, decontaminate all surfaces and piping containing ACM, perform all necessary demolition to access hidden ACM, decontaminate and clean-up following removal activities, re-insulate all piping, etc., furnish all labor and materials, and comply with all state and federal laws. (Section 02055 at Section 1.02(A)(1-11), R.A., 21.) (emphasis supplied)
DCPO further contends, according to the plain language of Section 1.13(A-C), the estimate section, that the asbestos abatement contractor must submit a base bid estimate for the containment and removal of all ACM, as identified in Section 02055 at Sections 1.01(A and B).[4] Therefore, DCPO argues that when TLT submitted a base bid estimate for ACM containment costs only, and relied on the unit price section to provide for ACM removal costs, TLT and DALA ignored the plain language of the asbestos abatement contract.
TLT responds, however, that Sections 02055 and 01025, when read together, create ambiguity. As a result, TLT asserts that the only reasonable interpretation of the contract is that the base bid estimate covers only ACM containment costs, whereas the unit price section covers all ACM removal costs. Finally, TLT argues that any ambiguity must be construed against DCPO, the drafter of the agreement.
In the first place, as indicated above, the contract is replete-with repeated references to the scope of work requiring not only the “containment,” but also the “removal."
As noted above, Section 1.02(A)(1,3, and 5) clearly indicates that the scope of asbestos abatement to be performed at the courthouse includes removal of all ACM from the courthouse. The section provides at 1.02(A):
A: The following is the scope of work, at a minimum, required to be performed by Asbestos Abatement Contractor for Asbestos Removal at the Roxbury District Court:
1. Removal and proper disposal of all asbestos-containing materials (ACM) and specified non-ACM materials from the Roxbury District Court and as depicted on the sketches .. . (R.A., 21.)
3. Removal and disposal of all insulating materials located in each Work Area . . . (R.A., 21.)
5. Removal and disposal of all contaminated debris located in the Work Areas. (R.A., 21) (emphasis supplied).
Furthermore, Section 1.02(B) identifies the type and estimated quantity of ACM, and requires the asbestos abatement contractor to totally isolate and remove all ACM, including:
pipe fitting insulation, pipe flange/valve insulation, VAT and mastic, flexible duct connectors and debris. The limit of ACM removal is indicated on the sketch. (R.A., 21.)
Finally, Section 1.13(A-C) informs the estimating contractor that:
The amounts identified in this Section [section 02055 at 1.02(A and B)] and on sketches represent the scope of work for the base bid. Any amount of material beyond or below the indicated scope of work shall be addressed using the unit price schedule to add to or deduct from the base bid amount. (Section 02055 at 1.13(A), R.A., 29.)
Based on all of the provision of the contract noted above, the Court concludes that, according to the plain language of the contract, the base bid was intended to include the contractor’s bona fide estimate of the cost of containment and removal of all ACM from the courthouse,[5] with the unit price to be utilized only with respect to any nonapparent discrepancies from the estimated base price.
Secondly, even were the Court to find ambiguity, and to resort to parole and extrinsic evidence, Donoghue v. IBC USA (Publications) Inc., 70 F.3d 206, 215 (1st Cir. 1995), Glick v. Greenleaf, 383 Mass. 290, 296 (1981), the testimony of Ronald Bussier, an employee of TLT’s sub-contractor Coastal, who performed the base bid and unit price estimates for asbestos abatement at the Roxbury District Courthouse, confirms the above interpretation of the contract’s plain meaning.
On direct examination, at the DALA hearing, Mr. Bussier testified that he specifically reviewed Sections 02055 and 01025 of the asbestos abatement contract (R.A., 166-168), and asserted that, after reviewing the specifications, he had never seen a unit price project for the Commonwealth of Massachusetts like the unit price project for the Roxbury District Courthouse (R.A., 181), so that “we weren’t able to quantify what we were quoting.” (R.A., 181 and 182.) He testified that he therefore concluded that the only reasonable way to bid the contract was interpret “base bid” to mean ACM containment costs only, and to interpret “unit pricing” to mean all ACM removal costs. (R.A., 181 and 182.) However, contrary to Mr. Bussier’s assertions that he could not quantify what he was bidding on, he admitted on cross examination that “if I had looked at the plans,” they showed the size of pipes (R.A., 188) and the number of ACM fittings (R.A., 193), but that, based on the manner in which he interpreted the *315 contract, he felt that he did not need to determine the number of fittings in order to fashion the base bid. (R.A., 193.) Moreover, contrary to TLT’s assertions that Section 02055 required a base bid estimate for containment costs only, he further admitted on cross-examination that Section 02055 included asbestos removal (R.A.,185) and that the language of the estimate section, Section 02055 at 1.13(A-C), indicated to him that the unit price section would cover asbestos abatement over and above the scope of the base bid section, not ACM removal costs for the entire base bid, as both he and TLT currently contend.[6] (R.A., 185.)
Based on Mr. Bussier’s own admissions, it is evident to the Court that he was aware that Section 02055 base bid included the removal of ACM from the courthouse, and that the unit price section was to be used only to make additions or deductions from the scope of his best estimate of asbestos abatement included in the base bid. His admissions, therefore, confirm rather than raise a question that the clear language of the contract required the base bid estimate to include the containment and removal of all ascertainable ACM, i.e. all ACM which was not “hidden or unknown” (see p.6 supra) and was not ambiguous.
Thirdly, even if the asbestos abatement contract could, contrary to the Court’s finding here, be construed to contain an ambiguity, TLT was obligated, in a matter so central to its bid, to investigate or at least make inquiry in order to resolve any ambiguity before submitting its bid. See: Richardson Electrical Co. v. Peter Francese & Son, Inc. 21 Mass.App.Ct. 47 (1985). Although, where a subtle ambiguity exists, there may be no duty to clarify, WPC Enterprises, Inc. v. United States, 323 F.2d 874 (Ct.Cl. 1963), where an ambiguity is glaring and obvious, and, as here, is central to the bid, a bidding contractor must investigate, or proceed at its own peril. Mountain Home Contractor v. United States, 425 F.2d, 1260, 1263-65 (Ct.Cl. 1970) (patent or glaring discrepancies in a government specification place a duty on the contractor to have it clarified) Beacon Construction Co. v. United States, 314 F.2d 501 (Ct.Cl. 1963).
Thus, in Beacon Construction Co., supra, because the government’s specifications put the contractor on notice that something was gravely askew, and because the contractor had ample cause and opportunity to seek an interpretation from the Government before consummating the agreement, the court held that the contractor was barred from recovering on the basis of ambiguity because, in such circumstances, the contractor could no longer rely on the principle that an ambiguity in a contract written by the Government should be construed against the drafter. 314 F.2d 501, 504 (Ct.Cl. 1963). The Court said
The bidder who is on notice of an incipient problem, but neglects to solve it as he is directed to do so by this form of contractual preventative-hygiene, cannot rely on the principle that ambiguities in contracts written by the Government are held against the drafter ... If the bidder fails to resort to the remedy proffered by the Government, a patent and glaring discrepancy should be taken against him in interpreting the contract.
Beacon Construction Co., supra, at 504.
Finally, the general contract between TLT and DCPO, made applicable to Coastal in its subcontract with TLT, contained a specific Notice to Contractors provision that required contractors to submit all questions regarding interpretation of the specifications to DCPO or be held responsible for any extra work arising out of a mistake in interpretation.[7] (R.A.,74.) Accordingly, if Mr. Bussier was perplexed as to what his bid was meant to include, as he testified, TLT was obligated, for this additional reason as well, to make inquiry of DCPO. Beacon Construction Co., supra.
ORDER
Accordingly, for each of the above reasons, the Court concludes that TLT’s and DALA’s interpretation of the contract was erroneous as a matter of law. Final judgment shall be entered in favor of the plaintiff, Division of Capitol Planning and Operations, vacating DALA’s award of Change Order No. 30 to TLT.

 The Record Appendix is refered to as “R.A.”

 All emphasis is supplied.

 Section 1.02(E) of the unit price section provides:
Total amount of all unit price work shall be included in amount to be entered in Item 1, work of General Contractors, or Item 2, work of Filed Sub-contractors, in Form for General Bid. (R.A., 15.)
Items 1 and 2, located in the Form of General Bid at page E (R.A.,78-79) are subdivisions of TLT’s proposed contract price of $7,097,000.00. Item 1 covers the work performed by the general contractor, TLT, and Item 2 covers all work of the Filed Subcontractors. TLT submitted the asbestos abatement unit price estimates into its $3,367,454 bid for Item 1. (R.A, 78),

 In submitting estimates for asbestos abatement, Section 02055 provides at Section 1.13(A):
Bids shall not be based solely on the information provided. Asbestos Abatement Contractor shall make their own estimate of the amount of material to be removed, decontaminated, cleaned and disposed. Bids and cost of the work to be performed shall be based on the Asbestos Abatement Contractor’s own estimate of the work required. The amounts identified in this Section and on sketches represent the scope of work for the base bid. Any amount of material beyond or below the indicated scope of work shall be addressed using the unit price schedule to add to or deduct from the base bid amount.
Additionally, Section 1.13(B) provides:
ACM identified on the sketches is meant as a guide to the Asbestos Abatement Contractor in order to facilitate the Asbestos Abatement Contractor’s determination of the work and amount of ACM to be removed. Quantities and descriptions shown on the sketches are for information only and may not indicate the actual location and/or quantify of all ACM required to be removed by Asbestos Abatement Contractor under this Section.
Finally, Section 1.13(C) provides:
*316 Asbestos Abatement Contractor is required to remove all ACM from Roxbuiy District Court specified within the scope of work for this Section.

 It may be noted, under Defendants’ interpretation, the base bid price of $317,000 was only for containment, approximately three times the alleged cost of actual removal ($108,700).

 Questioning of Mr. Bussier on cross examination proceeded as follows:
Q: Okay. Well, let me direct your attention to Section 1.13 on Page 18 of Section 02055. This is Exhibit Number 8 at the top. Is there any language in that section that indicates that payments will be — payments under unit prices will be over and above the work called for in Section 02055?
A: Item A you’re talking about or the whole thing?
Q: Amounts identified in this section and on sketches represent the scope of work for the base bid. Any amount of material beyond or below the indicated scope of work shall be addressed using the unit price schedule to add and/or deduct from the base bid. Does that language tell you that the unit prices will be for work over and above this base bid in 02055?
A: Yes.
Q: And you referred to that for bidding?
A: I felt the base bid was the setup, not the removal
Q: Does 02055 call for setup?
A: Section 02055 is the asbestos removal.

 Notice to Contractors: All questions by prospective bidders as to the interpretation of the Notice to Contractors, form of proposal, form of contract, plans, specifications or form of performance bond and labor and materials or payment bond must be submitted in writing to the Office ... All bidders shall visit the site and examine all contract documents before submitting bids. Inspect and be thoroughly familiar with same and conditions under which work will be carried out. Neither the Commonwealth nor the Architect will be responsible for errors, omissions, and/or charges for extra work arising from General of Subcontractor’s failure to familiarize themselves with the contract documents or existing conditions. (R.A., 74.)